## A. O. VACHON v. NICHOLS-CHISHOLM LUMBER COMPANY.[1]

Nos. 18,301—(36 [2]—39 [3]).

December 5, 1913.

**Indian — sale of allotments at White Earth Reservation.**

Under the act of June 21, 1906 (34 St. 325), and the act of March 1, 1907 (34 St. 1015), removing restrictions upon the sale of allotments within the White Earth Indian Reservation by adult mixed-blood Indians, an adult mixed blood Chippewa Indian, whose allotment has been approved by the Secretary of the Interior, but who has not received a patent, cannot convey.[4]

[1] Reported in 144 N. W. 223, 148 N. W. 288.

[2] October, 1913, term calendar.

[3] April, 1914, term calendar.

[4] But see syllabus on page 304.

AFTER REARGUMENT.

July 10, 1914.

**Right of Indian to convey allotment.**

In an action by the administrator of a deceased mixed-blood Chippewa Indian allottee, Nay-tah-waush, of the White Earth Indian Reservation to recover, upon a written contract, the amount due on the sale of standing timber by the allottee, who conveyed prior to the issuance of either the trust patent or the fee patent, but after the Clapp amendment (Act of June 21, 1906, 34 St. 325, amended by Act of March 1, 1907, 34 St. 1015), the patent being issued and recorded after his death, it is *held*:

(1) That by the allotment the mixed-blood Chippewa Indian allottee acquired an estate in its nature conveyable; and that the Clapp amendment (Act of June 21, 1906, 34 St. 325, amended by the Act of March 1, 1907, 34 St. 1015), removed all restrictions upon the conveyance of the land allotted imposed by the general Indian Allotment Act of February 8, 1887 (24 St. 388).

(2) That upon the issuance of the patent in the name of Nay-tah-waush, after his death, the defendant had the legal title.

(3) That upon the record of the patent at the proper place of record, and its receipt and acceptance by the defendant, the cause of action upon the contract was complete in the administrator, though the contract provided for a delivery at a specified place at which it was not delivered.

(4) That the administrator can maintain the action for the purchase price though the sole heir of Nay-tah-waush conveyed the premises to the defendant and received the consideration.

Action in the district court for Becker county by the administrator of the estate of Nay-tah-waush, deceased, to recover $5,490 upon defendant's due bill. The answer admitted the execution of the writing set out in the complaint, but alleged that it was absolutely null and void, for the reason that at the time it was given it purported to be a contract relating to land upon the White Earth Reservation with said intestate, who, the defendant was informed, was a full-blooded Chippewa Indian at the time of its execution and delivery and the United States held the title in trust and, under the Federal laws, the intestate could not make a valid contract relating to the land. The case was tried before Taylor, J., who made findings and ordered judgment in favor of defendant. From an order denying his motion for amended findings of fact and conclusions of law or for a new trial, plaintiff appealed. Reversed after reargument.

*J. T. Van Metre* and *Frank L. Morrison*, for appellants.

*George B. Edgerton, R. J. Powell* and *J. H. Baldwin,* for respondent.

DIBELL, C.

This action is brought to recover upon a contract between plaintiff's intestate, Nay-tah-waush, and the defendant whereby the defendant agreed to pay the balance of the agreed purchase price of certain timber lands within 15 days after the issuance and delivery to it of the patent therefor. There were findings for the defendant and the plaintiff appeals from the order denying his motion for a new trial.

Nay-tah-waush was an adult mixed-blood Chippewa Indian of the White Earth Indian Reservation. The lands mentioned in the contract were allotted to him, and the allotment was approved by the Secretary of the Interior on September 13, 1907. On October 15, 1907, contemporaneously with the execution of the contract above mentioned, he conveyed the timber on the lands to the defendant. On January 20, 1908, he died. The plaintiff is his administrator. On February 6, 1908, a trust patent was issued by the United States in the name of Nay-tah-waush, as grantee, and it was recorded on January 12, 1909. On April 14, 1909, a fee simple patent was issued to the heirs of Nay-tah-waush, without naming them, and this patent was recorded on June 25, 1909.

The general Indian Allotment Act is the act of February 8, 1887 (24 St. 388). Section 5 provides that upon the approval of the allotments the Secretary of the Interior shall cause patents to issue in the name of the allottees declaring that the United States holds the lands allotted for a period of 25 years in trust for the sole use and benefit of the allottees. It further provides that any conveyance of the lands or any contract made touching them before the expiration of the trust period shall be absolutely null and void.

Section 6 of the act, as amended by the act of May 8, 1906 (34 St. 182) provides that when an allotment of land is made to an Indian and he dies before the expiration of the trust period, the land shall revert to the United States and the Secretary of the Interior shall ascertain the legal heirs of the Indian and cause a patent to be issued to them and in their names in fee simple; or in certain cases

the secretary may cause the lands to be sold. This same provision is found in the act of June 25, 1910, c. 431 (36 St. 855).

The amendment of June 21, 1906 (34 St. 325, 353) and the act of March 1; 1907 (34 St. 1015, 1034), provide in substance that all restrictions as to the sale, incumbrance or taxation of allotments within the White Earth Reservation theretofore or thereafter held by adult mixed-blood Indians shall be deemed removed, and that trust deeds theretofore or thereafter executed by the department shall pass title in fee, or the mixed-bloods, upon application, shall be entitled to patents in fee for their allotments. None of the statutes relative to the rights of the mixed-bloods were expressly repealed. The provision of section 5 relative to the issuance of trust deeds was not disturbed. The provision that upon the death of the allottee the land allotted to him should revert to the United States, and a patent issue to the heirs, they thus taking by grant and not by descent, was not disturbed.

The whole question here is whether the effect of the amendment was to remove all restrictions upon the right of the adult mixed-blood Chippewa to convey his lands after the approval of his allotment by the Secretary of the Interior and before the issuance of the trust patent, or whether in the interim his right of sale was still restricted. As we construe the various statutes bearing upon the rights and interests of the mixed-bloods it was not intended to give the mixed-bloods the right to convey before the issuance of patent and while they had nothing but an allotment. We are of the opinion that the restrictions removed by the amendment were restrictions theretofore operating within the trust period after the issuance of the trust patent, and that it was not intended that a mixed-blood whose allotment had been approved could convey prior to the issuance of the patent. By section 5 of the allotment act the United States declared that at a time after the allotment, provisionally fixed at 25 years, it would convey the lands in fee to the Indian, free of all charge and incumbrance, and that a conveyance by the Indian before that time should be void. It undertook to put in him a free and unincumbered fee title. The amendment of June 21, 1906, and March 1, 1907, intended to give him the free and unincumbered

fee title prior to the expiration of the 25 year period theretofore provisionally determined upon, with the unrestricted right to convey it when he got it, but it did not intend to give him the right of conveyance prior to fee title. It was intended that the Indian then holding a trust patent, or afterwards acquiring one, might convey without restriction, and that trust patents should be in effect fee patents.

If this be so the contract upon which suit is brought was not performed and the plaintiff cannot recover.

Order affirmed.

A motion for reargument was granted, the case was reargued, and on July 10, 1914, the following opinion was filed: .

DIBELL, C.

In this case a motion for reargument was granted. Additional briefs were filed, the whole case was reargued, and it has been considered by the court.

The action was brought to recover upon a written contract between the plaintiff's intestate, Nay-tah-waush, a mixed-blood Chippewa Indian of the White Earth Indian Reservation, and the defendant, whereby the defendant agreed to pay the sum of $5,490, upon the issuance and delivery to it of the patent for certain lands, Nay-tah-waush at the time giving the defendant a deed of the timber on the land, the amount stated being a portion of the purchase price. The court found for the defendant. The plaintiff appeals from the order denying his motion for a new trial.

The contract mentioned is as follows:

"Whereas, John Nay-tah-waush * * * has this fifteenth day of October, A. D. 1907, for a valuable consideration, sold and conveyed by a deed of conveyance, to the Nichols-Chisholm Lumber Co., of Frazee, Minnesota, all the timber now standing, lying, growing and being upon the following described real estate in the county of Clearwater, in the state of Minnesota, to-wit: Lot one (1) and the northwest of the southeast (NW. SE.), all in section 35, township one hundred forty-three (143) north of range thirty-eight (38).

"Now, therefore, there is a balance of the unpaid purchase price to the amount of the sum of Five Thousand Four Hundred Ninety and no hundredths dollars, which we hereby agree to pay to the said John Nay-tah-waush within fifteen days after the patent from the United States government shall have been issued and delivered to the said Nichols-Chisholm Lumber Co., at Frazee, Minnesota. This obligation shall be nonnegotiable until after said patent shall have been issued and delivered to said Nichols-Chisholm Lumber Co.

"In testimony whereof, the said corporation has caused these presents to be executed in its corporate name by its president, and its corporate seal to be hereunto affixed the date of first above written.

"Nichols-Chisholm Lumber Co.<br>"By J. A. Nichols, its president."

Prior to this contract and on September 13, 1907, the allotment to Nay-tah-waush of the lands described was approved by the Secretary of the Interior. On January 20, 1908, Nay-tah-waush died. The plaintiff is his administrator. On February 6, 1908, a trust patent was issued by the United States in the name of Nay-tah-waush, as grantee, and it was recorded on January 12, 1909. This patent ran to Nay-tah-waush and declared that the United States would hold the land allotted subject to all statutory provisions and restrictions "for the period of twenty-five years, in trust for the sole use and benefit of the said Nay-tah-waush, or, in case of his decease, for the sole use of his heirs, according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs, as aforesaid, in fee, discharged of said trust. * * *" On April 14, 1909, a fee simple patent was issued to the heirs of Nay-tah-waush, without naming them, and this patent was recorded on June 25, 1909. It recited an order of the Secretary of the Interior, directing that a fee-simple patent issue to the "heirs of Nay-tah-waush, a White Earth Mississippi Chippewa Indian," and granted the lands "unto the said heirs of Nay-tah-waush." They were nowhere named. The present action was commenced in 1910. Prior to its commencement, and on December 1, 1908, the sole heir of Nay-

tah-waush conveyed to the defendant the timber upon the premises described in the contract and received the consideration there provided.

The questions presented are substantially these:

(1) Whether by the allotment Nay-tah-waush acquired an estate in its nature conveyable; and, if so, whether the Clapp amendment (Act of June 21, 1906, 34 St. 325, amended by the Act of March 1, 1907, 34 St. 1015) removed the restrictions upon conveyance imposed by the general Indian allotment Act of February 8, 1887 (24 St. 388).

(2) Whether upon the issuance of the patent in the name of Nay-tah-waush, after his death, pursuant to the allotment, the defendant had legal title.

(3) Whether there was such performance of the contract as gives the administrator the right to recover the amount which by it the defendant agreed to pay.

(4) Whether in view of the exemption of allotments from debts incurred prior to patent, the sole heir of the allottee having conveyed the timber to the defendant, and received pay therefor, the administrator can recover of the defendant.

1. By the treaty of February 22, 1855 (10 St. 1165), the Mississippi band of Chippewa Indians, and others, ceded to the United States large tracts of land in the then territory of Minnesota. There were reserved and set apart large tracts for their permanent homes. By the treaty of May 7, 1864 (13 St. 693), the Chippewa Indians of the Mississippi, and others, ceded to the United States certain reservations, and in consideration of such cession the United States set apart for their future homes certain lands described in general terms in the treaty. By the treaty of March 19, 1867 (16 St. 719), the Chippewas of the Mississippi ceded to the United States all the lands secured to them by the treaty of May 7, 1864, and certain lands were set apart for their use to be located as nearly as possible in a square form. By the Act of January 14, 1889 (25 St. 642), usually referred to as the Nelson Act, provision was made for the appointment of a commission to negotiate with the different bands of Chippewa Indians in Minnesota for the cession and relinquishment

of all their title to all reservations except the White Earth and Red Lake reservations, and to so much of these reservations as was not required to fill allotments. From this resulted the White Earth Indian Reservation as we now have it. Some of the history of the reservation is found in Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, 40 L.R.A. 759. The general Indian Allotment Act of February 8, 1887 (24 St. 388), prescribes the method by which the Indian lands are to be passed to the Indians in severalty, following the general policy of the government to break up tribal relations and institute private ownership instead of community ownership. The act refers to Indian allotments generally and not merely to those upon the White Earth Indian Reservation. Section 5 of this act, so far as we need refer to it now, is as follows:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: Provided, that the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered."

Section 6 of the act, referring in general to the status, immunities and privileges of the Indians, as amended by the act of May 8, 1906

(34 St. 182), reads, so far as we have occasion to make reference to it, as follows:

"That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section five of this act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property: Provided, that the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: Provided, further, that until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States: And provided further, that the provisions of this act shall not extend to any Indians in the Indian Territory.

"That hereafter when an allotment of land is made to any Indian, and any such Indian dies before the expiration of the trust period, said allotment shall be cancelled and the land shall revert to the

United States, and the Secretary of the Interior shall ascertain the legal heirs of such Indian, and shall cause to be issued to said heirs and in their names, a patent in fee simple for said land, or he may cause the land to be sold as provided by law and issue a patent therefor to the purchaser or purchasers, and pay the net proceeds to the heirs, or their legal representatives of such deceased Indian.   The action of the Secretary of the Interior in determining the legal heirs of any deceased Indian, as provided herein, shall in all respects be conclusive and final."

The last paragraph is the amendment and is referred to as the Burke act.

The Clapp amendment (Act of June 21, 1906, 34 St. 325, at page 353) is as follows:

"That all restrictions as to sale, incumbrance, or taxation for allotments within the White Earth Reservation in the state of Minnesota, now or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple, or such mixed-bloods, upon application, shall be entitled to receive a patent in fee simple for such allotments; and as to full bloods, said restrictions shall be removed when the Secretary of the Interior is satisfied that said adult full-blood Indians are competent to handle their own affairs, and in such case the Secretary of the Interior shall issue to such Indian allottee a patent in fee simple upon application."

This act was amended by the Act of March 1, 1907 (34 St. 1015, at page 1034), so that the first portion of it read as follows:

"That all restrictions as to the sale, incumbrance, or taxation for allotments within the White Earth Reservation in the state of Minnesota heretofore or hereafter held by adult mixed-blood Indians," etc.

Section 5 of the allotment act provides that any conveyance of the allotted lands, or any contract touching them, before the expiration of the trust period, shall be absolutely null and void.   United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532. These are the positive restrictions and there are no others.

That Nay-tah-waush had an interest in its nature conveyable is without serious doubt. Everything had been done which entitled him to a patent, and nothing remained to be done but the ministerial act of issuing one. There is no reason apparent why mandamus would not lie to compel its issuance if it were refused. Ballinger v. U. S. 216 U. S. 240, 30 Sup. Ct. 338, 54 L. ed. 464. Counsel for the defendant properly enough suggests, citing Fairbanks v. U. S. 223 U. S. 215, 32 Sup. Ct. 292, 56 L. ed. 409, that the Secretary of the Interior might properly set aside an allotment and direct the issuance of a patent to another Indian. Even if this be so it does not affect the question before the court. The patent has been issued following and approving the allotment. The government is claiming nothing. There are no conflicting claims to the lands. There is no question as to heirship. Whatever estate the heirs of the allottee might take would be by descent and not by grant. An equitable estate was created.

In the absence of a restriction upon the right of conveyance the estate of the allottee was conveyable. This is clearly expressed in Goat v. U. S. 224 U. S. 458, 32 Sup. Ct. 544, 56 L. ed. 841, where there was brought in question the validity of a conveyance by a Seminole freedman. The statute of April 21, 1904 (33 St. 189, 204), removed all restrictions upon the alienation of lands of allottees of the Five Civilized Tribes of Indians who were not of Indian blood. In referring to the nature of the estate of the allottee the court said:

"The inalienability of the allotted lands was not due to the quality of the interest of the allottee, but to the express restriction imposed. Their equitable interest was one which, in the absence of restriction, they could convey. * * * And, hence, on the removal of the restrictions upon alienation, the adult allottees not of Indian blood were entitled to convey their surplus lands."

In Mullen v. U. S. 224 U. S. 448, 32 Sup. Ct. 494, 56 L. ed. 834, an action to cancel certain conveyances of allotted lands made by Choctaw Indians claimed to be in violation of Congressional restrictions, the court said:

"There being no restriction upon the right of alienation, the heirs

in the cases involved in this appeal were entitled to make the conveyances. The bill alleged that the tracts embraced in these conveyances were 'allotted lands,' and certificates of allotment had been issued. These Indian heirs were vested with an interest in the property which in the absence of any provision to the contrary was the subject of sale.   *   *   *   It does not appear from the allegations of the bill whether patents for the lands had been issued to the Indian grantors before the conveyances were made. But as the lands had been duly allotted, the right to patent was established.   *   *   * There was undoubtedly a complete equitable interest which,' in the absence of restriction, the owner could convey.   *   *   *   And any contention that the conveyances were invalid, solely because they were made before the issuance of patent—the lands not being under restriction—would be met by the proviso contained in section 19 of the act of April 26, 1906, 34 St. 137, 144."

In Deming Investment Co. v. U. S. 224 U. S. 471, 32 Sup. Ct. 549, 56 L. ed. 847, involving allotments to Seminole freedmen, the court said:

"Upon the allegations of the bill, these allottees, so far as they were adults, must be held to come within the provision of the act of April 21, 1904, 33 St. 189, 204, which removed all restrictions upon alienation by adult allottees not of Indian blood with respect to their surplus lands; and, by virtue of the allotment, they had an interest in the allotted lands which on the removal of the restriction they were entitled to convey."

That the construction suggested is correct is evidenced by the case of Monson v. Simonson, 231 U. S. 341, 34 Sup. Ct. 17, 58 L. ed. 260, where the Supreme Court, approaching the question from a different viewpoint, reached the same conclusion without' apparent consideration of its former holdings. That case involved an allotment under the act of February 8, 1887, to Henry A. Quinn, an Indian of the Sisseton and Wahpeton tribe. After the approval of the allotment and the issuance of the trust patent, and before the. expiration of the trust period, Congress tacked to an appropriation bill the following provision:

"That the Secretary of the Interior is hereby authorized and

empowered to issue a patent to Henry A. Quinn for the east half * * * South Dakota." Act March 3, 1905, c. 1479, 33 St. 1048, at page 1067.

Afterwards, on June 29, 1905, the Secretary of the Interior issued a patent, without restrictions, to the allottee. Prior to the patent the allottee conveyed. It was held that the restrictions were not removed until the issuance of the patent. The same act authorized the Secretary of the Interior to issue a patent to a number of other Indians of different tribes in South Dakota and in adjoining states, giving their names as in the case of Quinn, and containing a provision as follows:

"And all restriction as to the sale, incumbrance, or taxation of said lands are hereby removed."

The restrictions mentioned were those imposed by the Indian Allotment Act of February 8, 1887, with which we are here concerned.

The words used are substantially the words of the Clapp amendment; and in holding that the statute first quoted did not remove the restrictions as to the allotment to the Indian Quinn, until patent, the court said:

"And it is significant that the provision contains no words directly or presently removing the existing restrictions upon alienation, while other kindred provisions in the same act, relating to other allotments contain the words 'and all restrictions as to sale, incumbrance, or taxation of said lands are hereby removed.' It hardly can be said that the absence of those words in this instance and their presence in others is not indicative of a difference in meaning and purpose."

The removal of restrictions upon the right of alienation is a part of the general policy of Congress as indicated by its legislation. In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. ed. 848, the court said:

"Of late years a new policy has found expression in the legislation of Congress, a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the government to carry out this policy there can be no doubt. * * *

It is not within the power of the courts to overrule the judgment of Congress."

And in Monson v. Simonson, 231 U. S. 341, 34 Sup. Ct. 71, 58 L. ed. 260, the court said:

"The act of 1887 was adopted as part of the government's policy of dissolving the tribal relations of the Indians, distributing their lands in severalty and conducting the individuals from a state of dependent wardship to one of full emancipation with its attendant privileges and burdens."

We have considered the question as if one new to this court. It was, however, directly involved in Stephenson v. Lohn, 115 Minn. 166, 131 N. W. 1018. The defendant there was a mixed-blood Chippewa Indian of the White Earth Indian Reservation. On November 19, 1906, he was, by reason of such membership, the owner of an allotment. Judgment was on that day entered and docketed against him. A trust patent was issued to him on February 6, 1908. This patent recited an approval of the allotment by the Secretary of the Interior on September 13, 1907. Prior to February 1, 1909, a fee patent was issued to him. Goodwin sold his land on December 20, 1906, taking an instrument much the same as the contract involved in this case. The action was in the nature of a creditor's bill to have satisfied a judgment out of the money arising from the sale of Goodwin's land upon the ground that his transfer was fraudulent. In referring to the Clapp amendment of June 21, 1906, Chief Justice Start said:

"Goodwin, by virtue of this last amendment, became, on June 21, 1906, the owner in fee of the land in question, and all restrictions as to sale or incumbrance were removed, and the trust as to his land terminated on June 21, 1906."

The necessary effect of the holding was that the allottee acquired a conveyable estate before the trust patent and before the fee patent, and even before the approval of the allotment by the Secretary of the Interior. Prior to this decision the court, in Nicholson v. Congdon, 95 Minn. 188, 103 N. W. 1034, had considered the nature of the estate acquired under the Chippewa Indian treaty of February

22, 1855, before referred to, by virtue of the sixth article of which missionaries and other persons then residing by authority of law in the Indian country, ceded at the time, had the privilege of entering 160 acres without restrictions as to a conveyance of it. The present Chief Justice said:

"It was held by this court in Gilbert v. McDonald, 94 Minn. 289, [102 N. W. 712, 110 Am. St. 368] that a soldier's additional homestead entry vests in the entryman an equitable title to the land entered, which might be transferred and assigned, before final proof or patent was issued, and that when the patent was subsequently issued it related back to the date of entry. * * * In view of the principle established by these cases—particularly the case of Gilbert v. McDonald, supra—and in view also of the provisions of the treaty under which the land in question was acquired, it must be held that plaintiff acquired an equitable title to the land at the time of his application which passed by the Walker deed. The case is even stronger than those arising under the homestead or pre-emption laws, for here the treaty contains no provision against a sale or transfer, prior to the issuance of the patent, of the land located thereunder. The rights granted by the treaty were in their nature contractual, and, upon a selection and location of land thereunder, the interests of the party locating became definitely fixed; vesting in him an estate which he could convey before payment of the purchase price or issuance of the patent."

The defendant claims something for its construction by virtue of the Burke act of May 8, 1906. We cannot see that this aids its contention. The Clapp amendment was self operative. It applied immediately to the mixed-blood allotments of the White Earth Reservation and removed all restrictions upon their alienation. As stated by our own court, in referring to the allottee's interest after the amendment, "all restrictions as to sale or incumbrance were removed, and the trust as to his land terminated on June 21, 1906." The Clapp amendment fixed the status from then on of the White Earth mixed-blood Chippewa allottees.

The conclusion reached is supported by a simple reading of the

Clapp amendment and there seems not much need of construction. The controlling words are these:

"That all restrictions as to sale, incumbrance, or taxation for allotments within the White Earth Reservation in the state of Minnesota, now or hereafter held (heretofore or hereafter held) by adult mixed-blood Indians, are hereby removed."

The words are plain. Accepted as they read they convey a natural meaning in precise accord with the construction placed upon them by this court.

The cases cited in the next paragraph are of value upon the question, considered in a part of this paragraph, of the character of the estate acquired by the allottee.

2. The next question is whether upon the issuance of the patent in the name of Nay-tah-waush, after his death, pursuant to the allotment, the defendant had legal title.

When the United States issued the patent in his name, though he was then dead, it disclaimed legal title in itself and recognized title under the allotment. Good title was then in the defendant under the original conveyance from Nay-tah-waush.

In Gilbert v. McDonald, 94 Minn. 289, 102 N. W. 712, 110 Am. St. 368, involving a soldier's additional homestead, where, after the laying of the scrip the scripee gave a quitclaim deed, and died before the issuance of patent, it was held that the patent inured to his grantee. The court referred to R. S. (U. S.) 1878, § 2448,[1] which provides as follows:

"Where patents for public lands have been or may be issued, in pursuance of any law of the United States, to a person who had died, or who hereafter dies, before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees, or assignees of such deceased patentee as if the patent had issued to the deceased person during life."

In Meeker v. Kaelin, (C. C.) 173 Fed. 216, it was held that lands in an Indian reservation were not "public lands" within section 2448. The claim there was by the heirs of the deceased allottee, a Puyallup

[1] [U. S. Comp. St. 1901, p. 1512.]

Indian allottee, against the patentee. The allottee died prior to the approval of allotment and the heirs took nothing. Whether the allotted lands are public lands so that the section quoted applies is not of controlling importance. For the purposes of this case it may be admitted that they are not.

In Elwood v. Flannigan, 104 U. S. 562, 26 L. ed. 842, there was involved a treaty with the Potowatomies in which the United States agreed to grant and to convey by patent to Ash-kum, one of the chiefs and a reservee under the treaty, two sections of land to be selected under the direction of the President after the lands had been surveyed. After selection Ash-kum conveyed by deed with covenants of warranty. The patent was issued after his death. It was held that the lands inured to his grantee.

In Crews v. Burcham, 1 Black, 352, 17 L. ed. 91, involving the same treaty, where the patent was issued after the death of the reservee, who had conveyed before selection, the same result was reached.

In Doe v. Wilson, 23 How. 457, 16 L. ed. 584, which seems to have been the earliest case under this treaty, the reservee made a conveyance by deed with a clause of general warranty prior to selection. It was held that after selection and upon the issuance of a patent title was in the grantee.

There is no reason apparent to us why the general reasoning applied in the cases cited should not control in this case, even though it be that section 2448 is without application to Indian lands. We therefore hold that when the patent was issued in the name of Nay-tah-waush, though he was then dead, the defendant, as his grantee, had complete legal title.

3. The respondent claims that there was not a compliance with the conditions of the contract, because a valid patent was not issued to Nay-tah-waush and delivered at Frazee as therein provided. The patent, however, was recorded at the proper place of record, apparently at the defendant's instance. It took the patent. What it wanted was the title. We hold that it got title. It cannot now contend successfully that the contract was not performed.

4. After the death of Nay-tah-waush, and prior to the commence-

ment of this action, his daughter, who was his sole heir, conveyed the timber involved in the contract to the defendant for the purchase price mentioned in the contract. Apparently this was done upon the supposition that the later patent passed legal title to her, that Nay-tah-waush had no alienable title, and that the defendant received no title under its deed from him even after patent. As said before, the daughter of Nay-tah-waush took by descent and not by purchase.

The act of June 21, 1906 (34 St. 325), of which the Clapp amendment is a part, contains, at page 327, an amendment to the original allotment act relative to exemptions as follows:

"No lands acquired under the provisions of this act shall, in any event, become liable to the satisfaction of any debt contracted prior to the issuing of the final patent in fee therefor.

"That no money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in case of a minor, during his minority, except with the approval and consent of the Secretary of the Interior."

The claim is now made that since the property involved is exempt from debts, and the daughter, who is the sole beneficiary, having deeded to the defendant, the administrator cannot recover of him. The theory is much the same as that which prevents recovery by an administrator in an action for wrongful death when the beneficiary has settled with the defendant. See Sykora v. J. I. Case Threshing Machine Co. 59 Minn. 130, 60 N. W. 1008.

Waiving the fact that there is no proper pleading, and no finding, the claim of the defendant is disposed of, contrary to its contention, by Stephenson v. Lohn, 115 Minn. 166, 131 N. W. 1018. It does not appear that Nay-tah-waush did not have debts which might be made out of his real estate; nor does it appear that he did not have debts to which his personal property might be applied.

It is not to be understood that we put a construction upon the proper application of the second paragraph of the exemption statute.

The decision heretofore filed is vacated and the order is reversed.