STATE OF MINNESOTA *vs.* MARY CAMPBELL *et al.*

Argued May 16, 1893.    Decided June 1, 1893.

**Jurisdiction of Offenses Committed on Indian Reservation.**

> Unless otherwise provided by treaty with an Indian tribe, or by the act admitting the state into the Union, the criminal laws of the state, except so far as restricted by the authority of congress "to regulate commerce with the Indian tribes," extend to all crimes committed on an Indian reservation by persons other than tribal Indians.

**Indians not Subject to State Jurisdiction.**

> But Indians, while preserving their tribal relations, and residing on a reservation set apart for them by the United States, are the wards of the general government, and as such the subject of federal authority, and the power to legislate for them is exclusively in congress.    And for acts committed within the limits of the reservation, they are not subject to the criminal laws of the state.

Questions of law which arose January 29, 1892, on the trial of defendants, Mary Campbell and John Belonge, and were certified here by the District Court of Becker County, *Ira B. Mills,* J.

Defendants were indicted for the crime of adultery committed upon the White Earth Indian Reservation in Becker county, and were tried and found guilty.    They moved in arrest of judgment, but were overruled.    The defendant John Belonge was a Chippewa Indian living on the Reservation under the charge of an agent of

the Federal government, and receiving an annuity. The defendant Mary Campbell was a half-breed, the child of a Chippewa Indian mother. She married James Campbell, a white man, in 1889, and lived with him as his wife outside the Reservation until the Spring of 1891, when she deserted him and went to her mother on the Reservation, and in the Fall went to live with Belonge. The questions certified here under 1878 G. S. ch. 117, § 11, were whether or not these persons were subject to the jurisdiction of the state courts.

The Attorney General and *J. F. Irish,* County Attorney, for the State.

No appearance for defendants.

MITCHELL, J. The defendants were indicted, tried and convicted, in the district court of Becker county, of the crime of adultery, committed within the limits of the White Earth reservation, in that county, which had been set apart by the United States for the residence of a tribe of Indians which still retained their tribal organization, and were under the care and supervision of the federal government. Belonge was an Indian belonging to this tribe, who retained his tribal relations, and lived on the reservation under the charge of a government agent, and as such received annuities from the United States. Campbell was a half-blood, being the child (legitimate, as we must presume) of a white father and an Indian mother, who did not sustain any tribal relations, but lived with her husband on a farm in Pine county, where the defendant Campbell was raised, and where she was married to a white man, with whom she resided in the same county until shortly before the commission of the alleged offense, when she left him, and went to the White Earth agency, where she has drawn one annuity from the United States as an Indian.

The question which the court below certifies to this court is, in brief, whether, under this state of facts, the defendants, or either of them, are subject to the jurisdiction of the criminal laws of this state.

This reservation was not excepted from the general jurisdiction of the laws of the state by the act admitting the state into the Union, and our attention has not been called to any existing treaty

between the United States and this tribe of Indians excepting this reservation from the jurisdiction of the state. And we take it as well settled that, when not restricted by treaty with the Indian tribe, or by the act admitting a state into the Union, the jurisdiction of the state extends over the territorial limits of an Indian reservation so as to apply to all persons therein not tribal Indians under the care of the United States.

As it is evident from the facts stated that Campbell is not a "tribal Indian," we have no doubt that she is just as amenable to the criminal laws of the state for an offense committed on the reservation as she would have been had the offense been committed anywhere else in the state.

The case of the defendant Belonge is different.

It presents just this question: When not expressly restricted or prohibited by an existing treaty with the Indian tribes, or by the act admitting a state into the Union, do the criminal laws of the state (except so far as restricted by the constitutional authority of congress to regulate commerce with the Indian tribes) extend and apply to tribal Indians living under the charge of the general government on a reservation set apart by the United States for that purpose, so as to make them amenable to such laws for crimes committed within the territorial limits of the reservation?

The condition and *status* of the Indian tribes within the United States, their relations to the federal government, or to the states within whose territorial limits they happen to reside, are subjects which have given rise to much discussion in the courts, both state and federal, from a very early date. Their condition in relation to the United States is unlike that of any other two peoples. They are neither foreign nor independent nations, nor yet citizens of either the United States or of the states in which they reside.

Perhaps the best statement of their position is to be found in the opinions of Chief Justice Marshall in *Cherokee Nation* v. *State of Georgia*, 5 Pet. 1, and *Worcester* v. *State of Georgia*, 6 Pet. 515. Stated briefly it is, that as long as they retain their tribal relations, they are domestic, dependent communities, *under the guardianship and protection of the general government.*

While an Indian tribe resides in a territory, the ownership of the country and the right of exclusive sovereignty over it which exists in

the general government would, of itself, give congress the right to legislate for the Indians as well as all other persons residing therein.

And if this was the only source of such right, it would doubtless follow, as held in some cases, that, in the absence of a treaty or something in the act admitting the state into the Union restricting it, this jurisdiction would pass to the state, and thereafter the general government would have no power to legislate for the Indian tribes, except to "*regulate commerce*" with them. There are some decisions of state courts that go to this length, but, with one exception, they are all early decisions of southern states, within whose territorial limits the Cherokees and other southern tribes then resided, and were undoubtedly largely influenced by the intense local feeling existing on the subject at that time in those states. See *State* v. *Tassels,* Dudley, (Ga.) 229; *State* v. *Foreman,* 8 Yerg. 256; *Caldwell* v. *State,* 1 Stew. & P. 327. There are numerous cases holding that the state has jurisdiction of crimes committed by Indians who have abandoned their tribal relations, or by whites within the limits of a reservation, or by tribal Indians outside the limits of their reservation; but these are not in point. The same is perhaps true of cases where one of the original states had, prior to the formation of the general government, entered into treaty relations with a tribe of Indians within their boundaries, residing on a reservation set apart for them by the state itself.

There is no decision of the federal courts that a state can, even in the absence of a restriction in a treaty, or in the act admitting the state into the Union, extend its laws, either criminal or civil, over tribal Indians residing under the care of the general government upon a reservation set apart by it for that purpose.

It was held in *Worcester* v. *State of Georgia, supra,* that the state could not extend its laws, civil or criminal, over the Cherokee tribe.

It is true that the decision was substantially placed on the ground that this would be in conflict with the terms of the treaty between that tribe and the United States; but it must be noted that when that treaty was entered into the Indians were then living, not in a territory, but within an existing state of the Union.

Further, there is no authoritative decision of the federal courts that congress may not legislate in regard to crimes committed by or against tribal Indians under the charge of the general govern-

ment, within the territorial limits of a state, even in the absence of the reservation of any such right in the act admitting the same into the Union.    There are certain *dicta* of Justice McLean to that effect in *United States* v. *Bailey,* 1 McLean, 234; but the question has been conclusively settled the other way (at least, as to crimes committed within an Indian reservation) by the supreme court of the United States in *United States* v. *Kagama,* 118 U. S. 375, (6 Sup. Ct. Rep. 1109,) affirming the constitutionality of the act of March 3, 1885, (23 U. S. Stat. ch. 341, § 9.)

That act provides that "all Indians committing against the person or property of another Indian or other person any of the following crimes, viz. murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny, within *any territory* of the United States, and either *within or without an Indian reservation,* shall be subject therefor in the same courts and in the same manner, and shall be subject to the same penalties, as are all other persons charged with the commission of said crimes, respectively. *  *  *   And all such Indians committing any of the above crimes against the person of another Indian or other person *within the boundaries of any state of the United States, and within the limits of any Indian reservation,* shall be subject to the same laws, held in the same courts, and in the same manner, and subject to the same penalties, as all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

The late Justice Miller, speaking for the court, after pointing out that the right of congress to legislate for Indians in territories could be maintained merely upon the ownership and exclusive sovereignty of the United States in and over the country, then proceeds to consider the second clause of the statute, which legislates with reference to Indians within a state.    After conceding, what is almost self-evident, that the clause in the constitution giving congress the power to regulate commerce with Indians would not give it power to enact a system of criminal laws for Indians, having no relation to trade and intercourse with them, and suggesting that the statute does not interfere with the operation of state laws upon white people found within an Indian reservation, and that its effect is confined to acts of tribal Indians committed within the limits

of the reservation, he holds that this legislation is within the competency of congress, not because the right to enact it had been reserved by some treaty, or by the act admitting a state into the Union, but upon the broad ground that Indians, while preserving their tribal relations, residing on a reservation set apart for them by the United States, are the wards of the general government, and under its protection, and as such are the subject of federal authority, over which congress has the same power to legislate within the states as over any other subject of federal jurisdiction. And if they are thus under the control of congress, that control must be exclusive, for, as suggested in the case of the *Kansas Indians*, 5 Wall. 737, "from necessity there can be no divided authority." It would never do to have both the United States and the state legislating on the same subject.

By the act of 1885, presumably, congress has enumerated all the acts which in their judgment ought to be made crimes when committed by Indians, in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society would be not only inappropriate, but also practically to arrogate the guardianship over these Indians which is exclusively vested in the general government. Moreover, it is very evident that the state never intended to attempt to extend its criminal laws over tribal Indians for acts committed within a reservation. 1878 G. S. ch. 25, § 1, and Penal Code, § 539.

The exception among the decisions of the state courts on the subject to which we have heretofore alluded is the very exhaustive and able opinion in *State* v. *Doxtater*, 47 Wis. 278, (2 N. W. Rep. 439.)

But with all due deference to that eminent court, it seems to us that they have not given due weight to the fact that the jurisdiction of the federal government over these Indian tribes rests, not upon the ownership of and sovereignty over the country in which they reside, but upon the fact that, as the wards of the general government, they are the subjects of federal authority within the states as well as within the territories,—a doctrine which the supreme court of the United States has developed and announced, in the case of *United States* v. *Kagama, supra,* much more distinctly than in

any deliverance extant when *State* v. *Doxtater* was under consid-
eration, some fourteen years ago.

This cause is remanded to the court below, with directions to
proceed to judgment on the verdict as against the defendant Camp-
bell, but to discharge the defendant Belonge.

NOTE.  See *United States* v. *Thomas*, 151 U. S. 577.  [Reporter
(Opinion published 55 N. W. Rep. 553.)