JULIA SELKIRK v. P. O. STEPHENS and Others.

May 23, 1898.

Nos. 11,003—(130).

**Game Belonging to Indian—White Earth Reservation—Seizure Away from Reservation.**

> The plaintiff is an Indian, and a licensed trader on White Earth reservation. She purchased on the reservation a quantity of game killed thereon by tribal Indians, and transported it by wagon off the reservation to the nearest railway station, and there delivered it to a carrier, to be shipped out of the state. It was seized and confiscated while in possession of the carrier by the defendants, acting as game warden and game and fish commissioners of the state. *Held*, that the defendants' acts were legal.

Appeal by plaintiff from an order of the district court for Becker county, Searle, J., sustaining a demurrer to the complaint. Affirmed.

*M. L. Countryman*, for appellant.

*T. E. Byrnes*, for respondents.

START, C. J.

The material facts alleged in the complaint are: The plaintiff is an Indian, and an actual inhabitant of White Earth Indian reservation, situated within the limits of this state, and a trader thereon under a license from the United States. Prior to November 19, 1896, as such trader, she purchased upon the reservation, from Indians residing thereon who were members of the tribes located thereon, a quantity of game birds which were killed thereon by such Indians, consisting of prairie chickens and partridges, of the value of $485. On the day named the plaintiff attempted to ship the birds out of the state, and did transport them from the reservation by wagon to Detroit, the nearest railway station, and there delivered them to the express company for carriage out of the state to eastern states, to be there sold by her agents for her account. After the birds had been delivered to the express company, and while in its possession and in process of shipment out of the state, the defendant Stephens, as game warden of the state, acting under

the authority of his co-defendants, who constitute the board of game and fish commissioners of the state of Minnesota, seized the birds, and delivered them to the board, and thereupon the defendants, claiming to act as such officers, sold the birds and paid the proceeds thereof into the treasury of the state. The defendants interposed a general demurrer to the complaint, which was sustained, and the plaintiff appealed from the order sustaining it.

At the time of this attempted shipment of the birds out of the state the statute of the state for the preservation of game contained, with other provisions, the following:

"No person at any time shall catch, take or kill, or have in possession or under control any of the birds, animals or fish caught, taken or killed in this state   *   *   *   with intent to ship the same beyond the limits of this state, or with intent to allow or aid in their shipment out of this state, or shall ship or intentionally allow or aid in their shipment out of this state.   *   *   *"   G. S. 1894, § 2170.

"It shall be the duty of all the members of the board of game and fish commissioners, all game wardens, sheriffs and their deputies, constables and police officers of this state at any and all times, to seize and take possession of any and all birds, animals or fish which have been caught, taken or killed at a time, in a manner, or for a purpose, or had in possession or under control, or have been shipped contrary to any provision of this act. Such seizure may be made without a warrant." G. S. 1894, § 2177.

This statute makes it unlawful to ship game out of the state at any time, and authorizes its seizure and confiscation if the statute is violated. The statute is constitutional. State v. Northern Pac. Exp. Co., 58 Minn. 403, 59 N. W. 1100; Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600. It necessarily follows that the seizure in question was lawful, and that the complaint does not state facts constituting a cause of action, unless the fact that the game was killed on the reservation by Indians exempts it from seizure at a place within the state, and off the reservation, while it is in possession of a carrier for shipment out of the state.

The question for our decision is not whether our game laws may be enforced against Indians, so that they may be prosecuted and personally punished for its violation on the reservation. Were this the question, it would have to be answered in favor of the

Indians, for this court in the case of State v. Campbell, 53 Minn. 354, 55 N. W. 553, rightly held that tribal Indians on this reservation are not subject to the criminal laws of the state. . But the sole question here is the legal status of game found off the reservation and in the hands of the carrier for shipment out of the state, which was killed on the reservation by Indians. The answer to this question involves a determination of the extent of the jurisdiction of the state over this reservation.

The White Earth reservation is not unceded Indian country. It was such prior to 1855, but by an act of congress approved December 19, 1854 (10 Stat. 598), the president of the United States was authorized to enter into negotiations with the Chippewa Indians for the extinguishment of their title to all lands owned and claimed by them in the territory of Minnesota; the treaties so to be made to contain a provision that:

"The laws of the United States and the territory of Minnesota shall be extended over the Chippewa territory in Minnesota whenever the same may be ceded, and the same shall cease to be 'Indian country,' except that the lands reserved to said Indians, or other property owned by them, shall be exempt from taxation and execution; and that the act passed 30th June, 1834, 'to regulate trade and intercourse with the Indian tribes,' etc., be inoperative over the said ceded territory, except the 20th section, which prohibits the introduction and sale of spirituous liquors to Indians." 10 Stat. at 599.

Such a treaty was made February 22, 1855, and proclaimed April 7, 1855, whereby the Indians ceded to the United States all right, title, and interest of whatsoever nature which they had in and to a large tract of land therein described, and which included all of the land now known as "White Earth Reservation." Rev. Indian Treaties (1873) 263. This treaty reserved a number of tracts of land which were set apart for the homes of the Indians, but there was no reservation of the right of the Indians to hunt and fish on and over the ceded territory. None of these reservations included any lands within the limits of White Earth reservation. A portion of the land now included in the last-named reservation was set apart for the future home of the Indians by treaty of May 7, 1864, proclaimed March 20, 1865; and by treaty of March 19,

72 M.—22

1867, proclaimed April 18, 1867, there were set apart for the use of the Indians, in order to provide them with a suitable farming region, 36 townships of land, to include White Earth Lake and Rice Lake. Rev. Indian Treaties, 259, 271. Under the provisions of the treaty of 1867, what has since been known as White Earth reservation was established.

The legal effect of the treaty of February 22, 1855, was that the lands now embraced within the limits of White Earth reservation became public lands of the United States, and that every right of the Indians therein became absolutely extinguished. The laws of the then territory of Minnesota became operative over the whole territorial limits of the present reservation. When the territory of Minnesota became a state in 1858, the jurisdiction of the state was just as complete and absolute over the lands now included in the reservation in question as it was over any other part of the state, except as to the sale of spirituous liquors to the Indians. The state has never ceded or relinquished any part of this jurisdiction. Such jurisdiction was modified by the subsequent setting apart of the reservation for the use of the tribal Indians, under the control of the general government, to the extent only that the state cannot tax the property of the Indians, or interfere with the control of such Indians while on this reservation, or punish them for acts committed thereon in violation of its laws.

This limitation of the power of the state does not arise from the fact that the laws of the state are not operative upon this reservation, but it grows out of the personal relations of such Indians to the general government. They are its wards, and under its guardianship and control, and the state may not interfere with or impair the efficacy of such guardianship. Subject to this limitation, all of the general laws of the state, including its game laws, are in force in every part of White Earth reservation. A white man may be punished by the state for a crime committed thereon, but a tribal Indian may not be. State v. Campbell, supra.

After the Indian title to the land within this reservation was extinguished, and before it was set apart for the Indians in 1867, the state owned the game thereon in trust for the whole people of the state, with the right and duty to make and enforce such laws

as it deemed necessary for its protection and beneficial use. The state has never parted with this ownership and trust. It is, therefore, not true, as a legal proposition, whatever may be the case ethically, that the Indians own the game on this reservation, for it belongs to the state, and its game laws are operative upon this reservation. But its remedies for enforcing them are imperfect, in that it cannot punish Indians for violating such laws on the reservation. A white man on the reservation may be so punished.

It is unnecessary to, and we do not, decide whether the state may or may not interfere with game which is unlawfully in the possession of Indians on the reservation. But we do hold that when, as in this case, game is once off this reservation, and in the possession of any person or corporation in violation of the law, it may be seized and confiscated by the proper officers of the state without reference to where or by whom it was killed.

It is immaterial whether the shipment of the game in question commenced on the reservation or off it, at Detroit, for, if it commenced on the reservation, no question of interstate commerce can arise, for the reservation is a part of the state, and it has jurisdiction over it, except as we have stated.

Order affirmed.