STATE v. AL COONEY.

October 30, 1899.

Nos. 11,728—(18).

### White Earth Indian Reservation—Game and Fish.

> While the state authorities have a very extensive jurisdiction over the territory included in the White Earth Indian reservation, in this state, *held*, the tribal Indians on the reservation have, under their treaties with the United States, and the acquiescence of the state for over 30 years, a license to hunt and fish on the reservation, in their usual and traditional manner, in order to procure food for themselves, notwithstanding that the state laws prohibit such fishing and hunting.

Action of replevin in the district court for Becker county. Julia Selkirk intervened, and from an order, Baxter, J., overruling a demurrer to her complaint, plaintiff appealed. Affirmed.

*Dickson & Donnelly* and *J. N. True,* for appellant.

*M. L. Countryman,* for respondent.

CANTY, J.

This is an action of replevin for the meat of 14 deer. The action is brought in the name of the state, by authority of the board of game and fish commissioners, under the claim that such meat was in the possession of the defendant five days after the close of the open season, contrary to Laws 1897, c. 221, § 14.

Julia Selkirk intervened, and in her complaint of intervention alleges that at the time of the seizure of the game under the writ of replevin herein, such game was on the White Earth Indian reservation, in this state, and she was in the possession of the same and the owner thereof; that she is an Indian by birth, and a member of one of the tribes of Chippewa Indians dwelling on said reservation, and was, both at the time of the seizure of said game under the writ and at the time she acquired the same, authorized by the United States to trade and barter with the Indians on the reservation; that, during the time when the killing and possession of deer is authorized by the laws of this state, certain tribal Indians lawfully belonging upon the reservation killed the deer thereon, and during such open season bartered the same to her, and that she held the

same for the purpose of bartering the same to the Indians on the reservation, and of supplying the children attending the Indian school thereon with meat; and that no part of the meat was ever removed, or intended to be removed, from the reservation, except by plaintiff under said writ. Plaintiff demurred to this complaint, on the ground that it does not state either a cause of action or a defense, and appealed from an order overruling the demurrer.

In our opinion, the order appealed from should be affirmed. In Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, we had occasion to go into the history of the White Earth reservation. The territory covered by the reservation ceased to be Indian country in 1855, as it was in that year ceded by the Indians to the United States, and the laws of the United States and of the territory of Minnesota were then extended over the ceded lands, which remained in that condition until after Minnesota was admitted as a state, in 1858, and until 1864, when a new treaty was made with the Indians, and 1867, when another treaty was made, whereby these ceded lands were set apart as a reservation, and the Indians have since resided and maintained their tribal relations upon the same. We are of the opinion that while, under those circumstances, the jurisdiction of the state authorities over the territory covered by this reservation is very extensive, it is not so extensive as to enable the state authorities to destroy or impair the efficacy of the guardianship of the United States government over the Indians, or destroy the effect of the treaties of the United States government with the Indians.

To prohibit the Indian from fishing and hunting, in order to procure food for his own consumption, would undoubtedly impair or destroy such efficacy. He is less vicious, more contented, and more easily controlled when he is allowed to follow his traditional habits. He acquires the habits, and learns to follow the pursuits, of civilized man but slowly. By compelling him suddenly to break off his old habits, and attempting to compel him to form new ones, he becomes a loafer and a vagabond, both dangerous and criminal, who is a menace to the safety and well-being of all the civilized communities in the vicinity of his reservation. The state has, without objection, for more than 30 years, permitted the tribal government to exist within its borders on this reservation, and we are of the

opinion that the state cannot, at this late day, do any act which will practically destroy that government. Though they are both connected with the federal government, the tribal government and the state government are rather foreign to each other, and the rights, as against each other, of governments foreign to each other usually grow up out of acquiescence and tradition. We do not wish to be understood as holding that, as between the state government and the tribal government, tradition and acquiescence will have any such an extensive effect as it will between governments wholly foreign to each other; but still we think such tradition and acquiescence, as between the state government and the tribal government, may have sufficient effect to give the tribe a license to hunt and fish within the boundaries of the reservation, as this peculiar right is practically indispensable to the maintaining of the tribal relation. By the course of things for more than 30 years, it must be inferred that the United States government assumed that the Indians had a right to hunt and fish on the reservation, and the state government has acquiesced in that assumption. It is said in U. S. v. Holliday, 3 Wall. 407, 419:

"In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same."

After 30 years of the mutual recognition, by both the federal and state governments, of the right of these Indians to do something so essential to their tribal relations, we are of the opinion that the courts should follow this mutual recognition, and hold that, while the title to all the wild game is in the state, the Indians have a license to hunt on the reservation in their usual and traditional manner, in order to procure food for themselves. In Selkirk v. Stephens, supra, we held:

"This limitation of the power of the state does not arise from the fact that the laws of the state are not operative upon this reservation, but it grows out of the personal relations of such Indians to the general government. They are its wards, and under its guardianship and control, and the state may not interfere with or impair the efficacy of such guardianship."

The federal courts have strongly maintained the right of the federal government to prevent any action, by either the state or the private citizen, which will impair the efficacy of the guardianship of the federal government over its Indian wards. See U. S. v. Holliday, supra; U. S. v. Boyd, 42 U. S. App. 637, 27 C. C. A. 592, 83 Fed. 547; Cherokee Nation v. State, 5 Pet. 1; Worcester v. State, 6 Pet. 515. The two latter cases are instructive, and much in point here. Georgia was one of the 13 original colonies, and clearly, from the time of the treaty of peace with England (if not from the time of the Declaration of Independence) to the time the United States constitution took effect, Georgia had jurisdiction over the Indians within her borders, if any white man's government had such jurisdiction. But, notwithstanding that, it was held in these two cases that such jurisdiction devolved on the United States government.

But if this game was killed, or was being held, not for personal consumption by the Indians on the reservation, but for sale or disposal to persons other than the tribal Indians, or for shipment off the reservation, then such game is not protected by the license of the Indians to hunt in their traditional manner, and may be seized by the state authorities, whenever this can be done without interfering with the person of the Indian in whose custody or possession the game may be, even though it is so seized on the reservation. Whether the game here in question is protected by such license would ordinarily be a question for the jury, and cannot be determined on this demurrer.

Order affirmed.

COLLINS and BUCK, JJ., concur.

MITCHELL, J. (dissenting).

I am unable to approve this opinion. It seems to me that, in view of the history of this so-called reservation given in Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, the only logical conclusion is that the state has full and complete jurisdiction of the territory, and that the right of the Indians to kill game upon it is subject to all the game laws of the state. It may be that the remedies of the state for the enforcement of these laws are incomplete, so far as the

persons of the Indians are concerned; but, if so, it is not because the laws do not apply to Indians, but because of the exclusive guardianship of the federal government over tribal Indians on a reservation. This, however, would not stand in the way of the state reclaiming its own property.

I do not see any sufficient basis for the position that by tradition and acquiescence the state has given the Indians a right to hunt and fish unrestricted by its game laws. Game laws were in force when the government placed the Indians on these lands. If the state has in years past failed to enforce these laws as to Indians, the same is true as to white men. But, if there is any such traditional license, it does not extend beyond the right of an Indian to kill game on reservations, irrespective of state game laws, for his own personal consumption as food. It certainly cannot extend to the right to kill or keep game, in violation of the law, for the purpose of making it an article of commerce and sale. It is not the policy of the United States to perpetuate the tribal relation among Indians. On the contrary, its object is to induce the Indians to abandon their tribal relations and adopt the habits of civilized life as soon as possible. The only interest the government can have is to preserve for their Indian wards such rights as are essential to their existence while they do maintain the tribal relation.

In view of the fact that tribal Indians who have not adopted the habits of civilized life are accustomed to depend largely on the fruits of the chase for their food, it may be necessary that they should be allowed to kill game for that purpose on their reservations all the year, irrespective of the closed season under state laws. But there is no necessity that they should be allowed to kill it for the purpose of sale to others. It is a matter of common knowledge that these Indians realize very little from the game which they sell, and what little they do realize is quickly squandered. The idea of these Indians buying game from those who keep it for sale will cause a smile of incredulity on the part of those who know them best; but, even if they do sometimes buy it, it is the Indian who kills and sells the game, or the trader who keeps it for sale, and not the Indian who buys it for food, who is benefited. If an Indian has the money with which to buy venison, he is able to

buy beef or some other article of food with his money.  I know of no more effectual method of depleting game, in both Indian reservations and the adjacent country, than to hold that Indians may kill it for purposes of barter and sale, or that traders may buy and keep it for sale, during the closed season.  As far as I would be willing to go is that conceding, without deciding, that a tribal Indian has the right to kill game on this so-called "reservation" during the closed season, for consumption as food by himself and family, this is the limit of his right; that the right does not extend to killing or keeping it for sale, even to other Indians.

STAET, C. J.

I concur in the views of Justice MITCHELL.