JENS J. OPSAHL v. FRANK E. JOHNSON AND ANOTHER.[1]

July 20, 1917.

Nos. 20,390—(200).

**Intoxicating liquor — local option election — tribal Indian voters.**

At an election held in Beltrami county to determine whether the sale of intoxicating liquors should be prohibited 58 mixed and full blood Indians, of the Red Lake band of Chippewas, inhabitants of the Red Lake reservation, voted. Of these 6 were full citizens, having received allotments under the Dawes and Nelson Acts.[2] The others had applied for

[1]Reported in 163 N. W. 988.
[2][24 St. 388; 25 St. 642.]

allotments, but no action had been taken by the government. If these 52 mixed and full blood Indians, who were not allotees, had not voted, concededly, the result would have been in favor of prohibiting the sale of intoxicating liquors. The trial court found that the mixed bloods, comprising at least 46 of the 52, had adopted the habits and customs of civilization, and because thereof were qualified voters. It is *held:*

(1) The contestant went so far in sustaining the burden of proof on the proposition of noncitizenship of the 52, as a class, that if any exception existed among them it was for contestees to point out.

(2) Indians of the Red Lake band of Chippewas, inhabiting the Red Lake Indian reservation as wards of the government, are residents of the state within the meaning of article 7 of the Constitution.

(3) To entitle a noncitizen mixed blood Indian to the right of suffrage, his adoption of the habits and customs of civilization must go to the extent of submitting himself to the laws of the state. The evidence and findings established that the persons referred to were tribal Indians, residing upon the reservation as wards of the government, owing no allegiance to the laws of the state, not taxable, and not bearing any of the burdens to which other voters are subject.

Jens J. Opsahl appealed to the district court for Beltrami county from the determination of the county canvassing board of the election held August 14, 1916, on the question whether the sale of intoxicating liquor should be prohibited, wherein said board declared there were 1555 ballots cast at said election in favor of prohibiting the sale of liquor and 1569 ballots so cast in favor of the sale of liquor. Frank E. Johnson, intervener and contestee, and the county of Beltrami filed answers. The appeal was heard before Stanton, J., who made findings and ordered judgment that the voters decided against prohibiting the sale of liquor. From the judgment entered pursuant to the order for judgment, contestant appealed. Reversed.

*H. J. Loud, J. L. Brown* and *Montreville J. Brown,* for appellant.

*E. E. McDonald, T. C. Bailey* and *Graham M. Torrance,* County Attorney, for respondents.

HOLT, J.

On August 14, 1916, an election was held in Beltrami county to determine whether the sale of intoxicating liquors should be prohibited therein. The canvassing board found a small majority against prohib-

iting such sales. Appellant filed a contest which was duly tried, and the court made findings of fact and conclusions of law that, by a majority of 19, the voters determined that the sale of intoxicating liquors should not be prohibited. From the judgment entered pursuant to the findings this appeal is taken.

The contest is based solely upon the vote in the Red Lake precinct which is wholly within the Red Lake Indian reservation. In this election district 92 votes were cast. Thirteen were in favor of prohibiting the sale and 79 against. It is practically conceded that, if 52 of the 58 persons belonging to the Chippewa tribe of Indians, located on the Red Lake Indian reservation, who voted in this precinct had no right so to do, the majority was in favor of prohibiting the sale and the judgment should be reversed. The specific finding upon their status is as follows:

"That of these 58 there were six who possibly might be full blooded Indians, but it is probable that they were also mixed white and Indian blood. That all of said persons of mixed white and Indian blood had, prior to said election, adopted the habits and customs of civilization. That of said 58 persons, six had received allotments and that the others had filed applications for allotments, but no allotments had been made to them. That all of said 58 persons were members of what is known as the Red Lake tribe of Indians. That there was at Red Lake an Indian Agency in charge of an acting Indian Agent and disbursing officer, and that the names of said 58 persons were upon a payment roll and that they received payments from the United States government as interest upon moneys belonging to them and others held by the United States government."

Construing these findings in the light of the evidence, the treaties and acts of Congress relating to the so-called Red Lake Indians, we think it fairly appears that the 58 persons referred to were, with the possible exception of 6 full bloods, mixed blood Indians of the Red Lake band of the Chippewa tribe who, as members thereof, were entitled to live on the Red Lake reservation under the special care and protection of the Federal government, and who had not seen fit to sever this relation. It also appears that these Indians have adopted the habits and customs of civilization to quite an extent, in that they live in separate dwellings, constructed and furnished after the manner of the surrounding white sett-

lers. Most of them can understand and speak English and even write their names, are members of Christian churches, and make a living much the same way as people in the vicinity of the reservation.

The right to vote at our state and municipal elections is granted by article 7 of our state Constitution. Section 1 of said article provides that every male person of the age of 21 years and upwards belonging to either of these three classes shall be entitled to vote, if he has resided in the state and election district the specified time, viz.: "1. Citizens of the United States who have been such for the period of three months next preceding any election. 2. Persons of mixed white and Indian blood, who have adopted the customs and habits of civilization. 3. Persons of Indian blood residing in this state who have adopted the language, customs and habits of civilization, after an examination before any district court of the state, in such manner as may be provided by law, and shall have been pronounced by said court capable of enjoying the rights of citizenship within the state."

The burden was upon contestant to establish that these 52 voters did not possess the right to vote. It is claimed he fell short, because, even if it should be held that the persons referred to were not entitled to the right of suffrage as members of either the second or third classes of section 1, article 7, of the Constitution, the proof did not exclude them from the first class, that of citizens. It is true that a mixed blood Indian is a citizen if his father was. State v. Nicolls, 61 Wash. 142, 112 Pac. 269, Ann. Cas. 1912B, 1088. And no doubt more mixed bloods spring from a white father and an Indian or mixed blood mother than from a white mother and an Indian or mixed blood father. But it is also, probably, true that very many of the mixed bloods of a white father are not the issue of lawful wedlock. An illegitimate child takes the status of the mother. Alberty v. U. S. 162 U. S. 499, 16 Sup. Ct. 864, 40 L. ed. 1051. It is also well known that many of the white men who assumed relations with Indian women were not citizens. The citizenship of mixed and full bloods residing upon this reservation seems to us so extremely doubtful that we think contestant made a prima facie case of noncitizens as to all of the 58 who voted, except the 6 who had received allotments, when it was shown that these persons lived upon the government reservation as wards of the United States. In the evidence and findings these 52 per-

sons were treated as of one class, viz., mixed or full blood Indians in the same tribal relation. In this situation we think contestant sustained the burden of proof that the persons referred to were not entitled to vote as citizens on the assumption that they were the offspring in lawful wedlock of a full citizen father. If any exceptions existed we should look to the other side to pick them out, since the status of the whole class of these 52 voters was discredited because of the same general disqualifying conditions. Respondents concede that if the majority of the 52 did not possess the right of suffrage the judgment should go for contestant.

That these 52 mixed and full blood Indians were not citizens, and as such entitled to vote, because they were born within the territorial limits of Minnesota, must be considered settled. Scott v. Sanford, 19 How. 393, 15 L. ed. 691; Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. ed. 643; Board of Commrs. of Allen County v. Simons, 129 Ind. 193, 28 N. E. 420, 13 L.R.A. 512; Anderson v. Mathews (Cal.) 163 Pac. 902. Nor can we sustain the proposition that they have become citizens because of their application for allotments under the Dawes Act of 1887 [24 St. 388], supplemented by the Nelson Act of 1889 [25 St. 642]. No action had been taken by the government upon the applications when the election took place, except as to 6 of the 58, and, until some act of the government in recognition of the desired emancipation, it cannot be said that citizenship has been bestowed. In Elk v. Wilkins, supra (pages 106, 107), it is said: "But the question whether any Indian tribes, or any members thereof, have become so far advanced in civilization, that they should be let out of the state of pupilage, and admitted to the privileges and responsibilities of citizenship, is a question to be decided by the nation whose wards they are and whose citizens they seek to become, and not by each Indian for himself."

It is not claimed that the full bloods had complied with the provision of class 3, section 1 of article 7 of the Constitution, giving them the right to vote. We come then to the proposition whether the mixed bloods of the 52 qualified within class 2. The court so found. It is not to be denied that these mixed bloods have adopted the habits and customs of civilization to a certain extent. With the assistance of the Federal government and the schools maintained by it, these Indians have advanced considerably on the road of civilization. They, however, still cling to

some of the customs and habits of their race, and are governed in their relation with each other by their peculiar tribal rules and practices, subject, in a certain sense, to the advice and supervision of the Federal authorities. The facts as to their mode of life are much the same as in Bem-way-bin-ness v. Eshelby, 87 Minn. 108, 91 N. W. 291, where it was said: "While these facts show that the plaintiffs have reached a degree of civilization superior to that manifested by many white men, yet the facts warrant no other conclusion except that they are tribal Indians, and subject to the disabilities incident to their status as such." These 52 persons have not taken up the duties imposed by the state upon other voters. The lands they occupy and the improvements thereon are not subject to taxation. The lands whereon they reside and all funds from which their annual interest or annuities are paid are public lands and public moneys not subject to taxation. Stephens v. Cherokee Nation, 174 U. S. 445, 488, 19 Sup. Ct. 722, 43 L. ed. 1041. They are under a sort of guardianship of the Federal government with which the state cannot interfere. Can it be said that persons so situated have adopted the customs and habits of civilization within the meaning of the constitutional provision quoted? This is a new question in this state, and, so far as we are advised, the right of mixed blood Indians to vote under a constitution similar to our own has received no judicial interpretation elsewhere.

Respondents say the language of the Constitution, defining the class of mixed blood Indians to whom the elective franchise is extended, is so plain and unambiguous as not to be open to construction. But were it otherwise, it is said, the constitutional debates upon the provision under consideration and the practice thereunder, sanctioned by the authorities in charge of elections, indicate that these mixed blood Indians were entitled to vote. It is true the debates, especially in the Democratic branch of the constitutional convention from such men as Joseph R. Brown, Flandrau, Emmett, Curtis and others, warrant the deduction that it was not then deemed necessary that Indians and mixed bloods sever their tribal relation in order to become qualified voters. As to the practical construction, it is doubted that it has been so general a practice in this state to vote reservation Indians that this court can take judicial knowledge thereof. The record in this case is not convincing that such a practice prevails. To be sure, it is made to appear that this election precinct

has existed some 15 years on the reservation, and that some of these men probably voted before this. There were undoubtedly on the reservation persons in the employ of the government and others, full citizens, who were legal voters and a voting district could be lawfully established on that territory. Hankey v. Bowman, 82 Minn. 328, 84 N. W. 1002. But it by no means appears that the mixed bloods generally were allowed to vote; therefore no great weight should attach to the alleged practical construction.

Appellant takes the position that these Indians are not residents of the state within the meaning of said article 7, citing Sinks v. Reese, 19 Oh. St. 306, 2 Am. Rep. 397, and McMahon v. Polk, 10 S. D. 296, 73 N. W. 77, 47 L.R.A. 830. The cases cited relate to military reservations which do not occupy the same status as an Indian reservation. The holding in Hankey v. Bowman, supra, and such cases as State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L.R.A. 169; Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, 40 L.R.A. 759; State v. Cooney, 77 Minn. 518, 80 N. W. 696, is that state laws extend in a certain sense over the territory embraced in an Indian reservation, though not as to the wards of the government residing thereon. It is not so with a military reservation. We cannot therefore hold that simply because of their living within the reservation these mixed blood Indians were not residents of the state within the meaning of section 1, article 7, of the Constitution.

But there are other cogent reasons urged by contestant against holding mixed bloods living on Indian reservations entitled to vote. The exercise of the elective franchise is a participation in government and in the making of the laws to which all the inhabitants of a nation, state, or municipality must yield obedience. It cannot for a moment be considered that the framers of the Constitution intended to grant the right of suffrage to persons who were under no obligation to obey the laws enacted as a result of such grant. Or, in other words, that those who do not come within the operation of the laws of the state, nevertheless shall have the power to make and impose laws upon others. The idea is repugnant to our form of government. No one should participate in the making of laws which he need not obey. As truly said by contestant: "The tribal Indian contributes nothing to the state. His property is not subject to taxation, or to the process of its courts. He bears none of the burdens of civiliza-

tion, and performs none of the duties of the citizens." To emphasize this situation, we merely need call attention to the fact that, no matter in what respect tribal Indians, not citizens, would violate our election laws, they could not be punished therefor, provided the acts were committed on the reservation. State v. Campbell, supra. In Selkirk v. Stephens, supra, in speaking of the limitations of the state's jurisdiction over the Indian reservations and the tribal Indians thereon, it is said that the state cannot tax the property of the Indians, or interfere with their control while on the reservation, or punish them for acts committed thereon in violation of law, that they are the wards of the general government and the state may not interfere with or impair the efficiency of such guardianship. The syllabus in U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. ed. 228, referring to tribal Indians, is: "The states have no such power over them as long as they maintain their tribal relations. The Indians owe no allegiance to a state within which their reservation may be established, and the state gives them no protection."

Another reason for denying an intention to confer the right of suffrage upon tribal Indians is seen in the provisions of section 2, article 4, for representation in the legislature which reads: "The representation in both houses shall be apportioned equally throughout the different sections of the state, in proportion to the population thereof, exclusive of Indians not taxable under the provisions of law." Tribal Indians on reservations are not taxable. Selkirk v. Stephens, supra; U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532. Different provisions in a constitution should be harmonized. It is not thinkable that, when care was taken to exclude certain persons from the count when a district's representation in the legislature is to be determined, it, nevertheless, was intended that the persons so excluded should participate in the election of the representation so fixed. It is an indication that the persons excluded from being counted as a part of the population of the district are also to be excluded from participating either as voters or as candidates at elections.

It would seem rather incongruous for Indians to participate in elections relating to the sale of intoxicants. Their vote affects not their own personal needs, for the law makes it a crime to furnish them with intoxicating liquors. G. S. 1913, §§ 3148, 3182. This prohibition follows an Indian even when a citizen. State v. Wise, 70 Minn. 99, 72 N. W. 843.

138 M—4

In Ontario the elective franchise appears to be conferred upon Indians on government reservations. An act, called the Canada Temperance Act, is in force under which an election similar to the one here in question may be held. There, as here, exists a stringent law against furnishing liquor to Indians. Re Metcalf, 17 Ont. 357, 359, 360, the question arose whether at such an election the votes of Indians dwelling upon the Indian reservation could be received. In granting a prohibition against receiving such votes from Indians upon the reservation, but not from electors residing thereon, the court said: "The special act governing the Indians was more stringent than any law governing the white population, and the Canada Temperance Act can have no operation where the Indian Act is in force. The Indians are supposed, and properly supposed, not to be able to govern themselves as to the use of 'fire water,' as they call it, and therefore the legislature has wisely placed a stringent law upon the statute book. The township of Tuscarora is under that law, and the Indians dwelling there have nothing to do with the Canada Temperance Act. It is a violation of the first principles of justice to say that Indians should be allowed to vote upon the repeal of the act. It would be another phase of the wrong done in the taxation of the colonies." We do not decide that under our Constitution a person, who is a qualified elector, may be denied the right to vote upon some certain proposition. But the argument advanced in the case cited has force, and bears on the unreasonableness of holding that the framers of the Constitution intended to extend the suffrage to those who are excluded from count in fixing the representation in the legislature, and to persons who will not be subject to the laws which the legislature may enact.

We reach the conclusion that tribal Indians have not adopted the customs and habits of civilization, within the purview of the elective franchise provisions of our Constitution, until they have adopted that custom and habit which all other inhabitants must needs adopt when they come into the state, namely, that of yielding obedience and submission to its laws. No doubt the right of suffrage was by this state held out as an inducement to the Indians to sever their tribal relations and adopt in all respects the habits and customs of civilization, and that means a taking up of the burdens which the laws of the state place upon all its inhabitants alike. This the Indian may do by taking up his abode outside the reser-

vation and there pursuing the customs and habits of civilization.    The policy of the general government also is to accelerate this emancipation. When lands are allotted under the Dawes and Nelson Acts, the allottee becomes a full citizen.    This has not been accomplished as to any of the Indians in question except the six mentioned.

We think the learned trial court erred in his conclusions and the judgment should be reversed.

So ordered.

Chief Justice Brown did not sit in this case.