## STATE v. JOE BUSH, SR.[1]

November 15, 1935.

No. 30,481.

*George F. Sullivan,* United States Attorney, and *John L. Wheeler,* Assistant United States Attorney, for appellant.

*Harry H. Peterson,* Attorney General, *Matthias N. Orfield,* Assistant Attorney General, *Armond D. Brattland,* Special Assistant Attorney General, and *L. A. Wilson,* County Attorney, for the State.

HILTON, JUSTICE.

Appeal from a judgment of the district court sustaining a judgment of a justice court finding the defendant, Joe Bush, Sr., guilty of a violation of the state game and fish laws.

The facts were stipulated as follows:

"(2) That the defendant above named is a full-blood Indian by birth and is 62 years of age; that he now is and always has been an enrolled member of the Mille Lacs Removal Band of Chippewa

[1] Reported in 263 N. W. 300.

Indians; that he now is and at the time of the offenses alleged in the complaint herein lawfully was resident upon and within the White Earth Indian Reservation upon unpatented lands known as 'The Rice Lake Reserve'; that he now is and always has been lawfully entitled to money payments, allotments and annuities as a member of the aforesaid band of Indians; that he is under the charge of the Indian Superintendent of the Consolidated Chippewa Agency at Cass Lake, Minnesota, and was under such charge on and before March 25, 1933; that the White Earth Indian Reservation now is and at the time of the offenses alleged in the complaint herein, and for many years prior thereto, was an Indian Reservation duly established by Treaty, concluded and ratified, with the Chippewa Indians, by Executive Orders of the President of the United States and by the laws of the United States;

"(3) That defendant, under his Indian name, to-wit: O-pah-Ke-Dub-e-tung, received from the United States many years ago Trust Patents, issued under authority of the laws of the United States relating to land allotments on the Reservation aforesaid, to the following tracts of lands, lying within the boundaries of said Reservation, to-wit: [legal description of land].

"That defendant, long prior to March 25, 1933, received a patent in fee simple from the United States covering the tracts of land aforesaid, which tracts of land he sold and conveyed to white persons, in fee simple, subsequent to the issuance by the United States of said fee simple patent and long prior to March 25, 1933;

"(4) That on the forenoon of March 25, 1933, defendant trapped two muskrats in the waters of Roy Lake, which now is and all during and since 1858 has been a navigable body of water in law and in fact, lying within the boundaries or limits of said White Earth Indian Reservation, * * *;

"That on the forenoon of March 25, 1933, at 11:20 A. M. defendant was arrested and was found in the possession of said muskrats by a State Game Warden, on the ice covering Roy Lake, the distance from the shore line thereof being unascertainable, at a point on said lake where lands patented in fee simple and conveyed to white persons abutted; said place of arrest lying within the

exterior limits or boundaries of said White Earth Indian Reservation;

"That the lake and lands mentioned and described in this paragraph numbered four lie in the Town of Twin Lakes, in the County of Mahnomen, Minnesota, and are situate within the exterior limits of said Indian Reservation;

"(5) That the carcasses and pelts of the muskrats, trapped and possessed as aforesaid, were intended for the defendant's own personal use and were not intended by defendant either to be sold or marketed in any fashion."

The sole question in this case is whether under the facts hereinbefore recited the defendant was subject to the state game and fish laws prohibiting the doing of the act which admittedly he did. It is the defendant's contention that such jurisdiction, if any, is exclusively vested in the federal government.

"The ownership of wild animals so far as they are capable of ownership, is hereby declared to be in the state, not as a proprietor, but in its sovereign capacity as the representative and for the benefit of all its people in common." 1 Mason Minn. St. 1927, § 5496.

That a state has the power to legislate for the protection of game within its borders was upheld in Geer v. Connecticut, 161 U. S. 519, 16 S. Ct. 600, 40 L. ed. 793.

"Muskrats may be taken only by trapping in such counties of the state and in such numbers and during such times in the several counties, not exceeding 30 days between March 1 and April 30, both inclusive, in any year in any county, and subject to such other provisions not inconsistent with law, as the commissioner may by regulation from time to time prescribe according to conditions existing in the respective counties." L. 1929, c. 418, § 4, 3 Mason Minn. St. 1934 Supp. § 5542(2).

At the time of the taking of the muskrats in question Mahnomen county was closed to such trapping, and the taking thereof was unlawful, it being a misdemeanor and punishable as such.

A brief résumé of the legislation relative to tribal Indians living on the White Earth Indian Reservation will be helpful. Until 1855 the territory included in the reservation was unceded Indian territory. By the treaty of February 22, 1855, Revision of Indian Treaties (1873), 263, certain bands of Chippewa Indians ceded to the United States all title and interest in a large area of land, a part of which constituted the present White Earth Reservation. From that date until 1867 the Chippewa Indians had no rights within the ceded area, and the jurisdiction of Minnesota over it, both as a territory and as a state, was as complete as over any other area within its limits, except that intoxicating liquors could not there be sold. By the treaty of March 19, 1867, Revision of Indian Treaties, 271, the White Earth Indian Reservation was set apart out of the larger tract. For the history of the Chippewa Indians and as to their interest in the Allotment Act of 1889, hereinafter mentioned, see United States v. Mille Lac Band, 229 U. S. 498, 33 S. Ct. 811, 57 L. ed. 1299.

Until 1885 there was but meager legislation under which an Indian could be held accountable for committing acts of a criminal nature. In Ex Parte Crow Dog (1883), 109 U. S. 556, 3 S. Ct. 396, 27 L. ed. 1030, it was held that there was no authority by which the federal courts could assume jurisdiction to punish a tribal Indian for the killing of another member of his own tribe, even though the homicide occurred within a place and district under the exclusive jurisdiction of the United States. As a result of that decision, congress enacted the so-called "Seven Crimes Act" on March 3, 1885, 23 St. 385, 18 USCA, § 548, which, with subsequent amendments, provided:

"All Indians committing against the person or property of another Indian or other person any of the following crimes, namely— murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, burglary, and larceny, within any Territory of the United States, and either within or without an Indian Reservation, shall be subject therefor to the laws of such Territory relating to such crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to

the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases. And all such Indians committing any of the above-named crimes against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian Reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.  *  *  *"

By an act of congress of February 8, 1887, 24 St. 388, 25 USCA, § 331, *et seq.*, a system for the division of all tribal lands among the various individual members of the Indian tribes, was established. Section 5 of that act provided:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever; *Provided,* That the President of the United States may in any case in his discretion extend the period.  *  *  *  *Provided,* That the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered.  *  *  *"

Section 6 of the same act provided:

"Upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made *shall have the benefit of and be subject to the laws, both civil and*

*criminal, of the State or Territory in which they may reside;* and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. \* \* \*" (Italics ours.)

The defendant, Bush, received his allotments of land under the provisions of the Allotment Act of January 14, 1889, 25 St. 642, which gave to certain bands of the Chippewa Indians of Minnesota allotments on the White Earth Reservation and adopted the provisions of the General Allotment Act of 1887 to effect this purpose. On May 8, 1906, 34 St. 182, 25 USCA, § 349, § 6 of the 1887 act was amended so as to read:

"At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, \* \* \* *then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside.* \* \* \* *Provided further,* That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States. \* \* \*" (Italics ours.)

It is clearly evident from the tenor of these acts that congress intended that the state courts were to have jurisdiction in cases such as the one we have here. This is well brought out by the language of the federal courts. In United States v. Kiya (D. C. 1903), 126 F. 879, the court held that it had no jurisdiction to punish an Indian who had committed rape on an Indian girl living on a reservation. Both parties resided on allotted land. The court in referring to § 6 of the General Allotment Act of 1887 stated [126 F. 881]:

"The language quoted plainly makes them amenable to the criminal laws of the state, and thereby removes them from the plane of national penal legislation, unless such legislation is by express provision in particular cases made applicable to them. \* \* \*

"It is doubtless true that Congress might have conferred upon Indians residing upon allotted lands all the rights of citizenship, and yet reserved to Congress control over them as wards of the

government. The question here, however, is not what Congress can do, but what it has done. * * *

"A full consideration of these statutes seems to lead to the conclusion that Indians in the state of North Dakota residing upon allotted lands are subject to the laws of the state, both civil and criminal, and that they are not subject to federal law except in cases where Congress has so expressly provided, as in the statute dealing with the subject of intoxicating liquors. * * *"

The federal courts were held in United States v. Pelican (1914), 232 U. S. 442, 34 S. Ct. 396, 58 L. ed. 676, to have jurisdiction to punish a felon who killed an Indian on a reservation. However, the deceased held his land in trust at the time he was killed, and the case arose after the enactment of the act of 1906 by which § 6 of the act of 1887 was amended so as to postpone to the expiration of the trust period the subjection of allottees under that act to state laws. The court intimated that had the trust period expired prior to the time of the offense the state courts would have had jurisdiction. The Wisconsin court held in State v. Rufus (1931), 205 Wis. 317, 237 N. W. 67, that the state could not punish an Indian who had committed rape within the limits of a reservation. The Indian in question had received no certificate of competency from the federal government. It is apparent then that congress intended to retain control over him. There is no evidence of such an intention in the instant case. Furthermore, Bush had received his patent in fee at the time of the commission of the misdemeanor.

Several federal cases, decided since the enactment of the act of 1906, indicate that the state courts would have jurisdiction to punish an Indian for doing an act contrary to a state law where the Indian had received his allotment in fee simple and the trust period had expired. In the case of Eugene Sol Louie v. United States (1921), (C. C. A.) 274 F. 47, the defendant, an Indian, killed another Indian on a reservation. He was convicted of murder in the lower federal court. On appeal it was held that the federal court had no jurisdiction as the defendant had received his patent in fee. In so doing the court stated [274 F. 49]:

"Inasmuch as patent was issued \* \* \* we think that Louie as an allottee became subject to the laws, civil and criminal, of the state in which he resided.

"The fact that the land was situate within the limits or boundaries of an Indian Reservation is immaterial, because the allottee of the fee-simple patent was expressly declared to be subject to the laws of the state within which the land is situated. This view is strengthened by the fact that the proviso \* \* \* expressly declares that, until the issuance of fee-simple patents, all allottees to whom trust patents shall thereafter be issued shall be subject to the exclusive jurisdiction of the United States. Such emphatic retention of exclusive jurisdiction until fee-simple patent shall issue brings into relief the equally positive prior declaration that after patent shall have issued the allottee shall be subject to the laws of the state in which he resides."

A similar case in accord with the views just expressed is State v. Monroe, 83 Mont. 556, 274 P. 840, which was approved in United States v. Sherburne Merc. Co. (C. C. A.) 68 F. (2d) 155; see also 39 Yale Law Jour. 307. Although the case of Dickson v. Luck Land Co. (1917) 242 U. S. 371, 37 S. Ct. 167, 61 L. ed. 371, affirming 132 Minn. 396, 157 N. W. 655, has to do with civil law, the court in pointing out that an Indian on the White Earth Reservation who had received his land in fee must comply with the state laws with respect to conveyances, does throw some light on what congress intended by the act of 1906. The court declared [242 U. S. 375]:

"With those restrictions entirely removed and the fee simple patent issued it would seem that the situation was one in which all questions pertaining to the disposal of lands naturally would fall within the scope and operation of the laws of the State. And that Congress so intended is shown by the Act of May 8, 1906, c. 2348, 34 Stat. 182, which provides that when an Indian allottee is given a patent in fee for his allotment he 'shall have the benefit of and be subject to the laws, both civil and criminal, of the State.' "

We have carefully considered all the federal cases cited by the defendant and find no difficulty in harmonizing them with the views

herein expressed. Defendant cites several Minnesota cases which he contends support his position. State v. Cloud (1930), 179 Minn. 180, 228 N. W. 611, is readily distinguishable. There the defendant, a full-blood Indian, had received his allotment, but it was held in trust for him by the United States at the time the muskrat was taken. The act constituting the offense with which he was charged was committed wholly within the limits of his allotment on which he was living. Selkirk v. Stephens (1898), 72 Minn. 335, 75 N. W. 386, 40 L. R. A. 759, is not in point. There the court recognized that the game laws of the state were operative upon the White Earth Reservation, although it was under the impression that the remedies for enforcing them were imperfect. This was based upon the decision in the case of State v. Campbell (1893), 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169. However, it is significant that neither in that nor in State v. Cooney (1899), 77 Minn. 518, 80 N. W. 696, was any reference made, in either the opinions or the briefs of counsel, to § 6 of the act of 1887 making the Indian subject to the state laws, both criminal and civil, upon the issuance of a patent. Apparently that act was not considered by the court. Furthermore, there is nothing in those cases to indicate that a patent had been issued to either of the defendant Indians. Thus it appears that the facts differed from those of the instant case. The strong and persuasive language used by the able jurist in State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, relative to the status and condition of the Indians and their relation to the federal government at that and prior times was not necessary to the decision of the case and certainly has not, for many years last past, been applicable. This is borne out by the dissenting opinion of the writer of the opinion in the Campbell case, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, and the then Chief Justice in State v. Cooney, 77 Minn. 518, 80 N. W. 696, and also by the fact that congress itself by the act of 1906 recognized an advancement in the civilization of the Indian. Although not strictly in point with the facts of the instant case, we think that the comment of the Nebraska court in Kitto v. State, 98 Neb. 164, 152 N. W. 380, L. R. A. 1915F, 587, relative to the relation then (and now) existing between the

Indian and the state is most pertinent. There it was stated [98 Neb. 171]:

"The defendant and other allottees of his tribe within the state of Nebraska are given the full protection of its laws. They are citizens of the state. They are electors. They are entitled to hold office. They are competent to serve on juries, thereby participating in the enforcement of the laws, both civil and criminal, of the state. They have accepted allotments of land and with it citizenship. They have adopted the habits of civilized life. They are residing upon their allotments, to all intents and purposes separate and apart from any tribe. They are no longer bound by the laws or customs of their tribe. Congress has not reserved to the federal courts the jurisdiction to ·punish for misdemeanors. If such jurisdiction is not vested in the state courts, it is not vested anywhere, and the perpetrators of misdemeanors of all kinds on an Indian reservation may go, unpunished. Such clearly, was not the intention of Congress. It is not to be found within any of its enactments. It is against public policy, and contrary to the laws of this state, which extend to all, both Indians and white men, within or without the limits of a reservation, the equal protection of the law. * * *"

In this regard see Perrin v. United States, 232 U. S. 478, 486, 34 S. Ct. 387, 58 L. ed. 691, approved in Johnson v. Gearlds, 234 U. S. 422, 446, 34 S. Ct. 794, 58 L. ed. 1383, which involved the sale of liquor on the White Earth Indian Reservation. From the foregoing authorities we conclude that the state had jurisdiction in this case and that the defendant was properly convicted.

Affirmed.

STONE, JUSTICE, concurs in the result.