BEM–WAY–BIN–NESS and Others v. EZRA ESHELBY and Others.[1]

July 11, 1902.

Nos. 12,922—(31).

**Indian—Bringing Action.**

A tribal Indian, whether he be a citizen or not, may maintain an action in the courts of this state to redress any wrong committed outside the limits of his reservation against his person or property.

**Jurisdiction of District Court.**

The plaintiffs are tribal Indians living on their reservation. They brought an action in the district court of the county of Red Lake to recover the possession of an undivided interest in a section of land lying outside of any Indian reservation, and which is in possession of citizens of this state. *Held*, that the district court has jurisdiction of the subject-matter of the action and of the parties thereto.

Action of ejectment in the district court for Red Lake county by plaintiffs Bem-way-bin-ness and others, tribal Indians, against Ezra Eshelby and others, defendants. The case being at issue, an alternative writ of prohibition was issued out of the supreme court on the petition of defendants, restraining plaintiffs and Hon. William Watts, judge of said district court, from further proceeding in the action, also an order to show cause why the writ should not be made absolute. Writ and order to show cause discharged.

[1] Reported in 91 N. W. 291.

*Davis, Kellogg & Severance,* for petitioners.

*Charles Loring, A. A. Miller* and *Halvor Steenerson,* for respondents.

START, C. J.

The United States, by article 9 of a treaty made October 2, 1863 (13 Stat. 669), between it and the Red Lake and Pembina bands of Chippewa Indians, set apart from the tract thereby ceded a reservation of six hundred forty acres near the mouth of Thief river for the chief Moose Dung. The land ceded was a large tract of country to the west of Thief river, including all of the valley of the Red River of the North in Minnesota and the then territory of Dakota. Moose Dung selected his land at the mouth of Thief river, and thereafter made his home thereon until his death in 1872, which was before the lands were surveyed. He was succeeded as chief by his eldest son, Mon-si-moh, known as "Moose Dung, the Younger." The land so selected was subsequently surveyed, and is the section of land here in controversy. It lies on the westerly side of Thief river, and within the limits of the ceded tract, and is not a part of any Indian reservation. The reservation to Moose Dung was a conveyance of the land in fee simple, without any restrictions on his or his heirs' right to convey it. Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1. The petitioners herein are now in possession of the land, claiming to be the sole owners thereof by virtue of a conveyance of it from Moose Dung, the younger. The respondents are full-blood lineal descendants, either children or grandchildren, of Moose Dung, the elder, and claim as his heirs an undivided five-sixths of the land.

For convenience we designate the respondents as "plaintiffs" and the petitioners as "defendants," according to their relative positions in the district court. The plaintiffs, in September, 1901, commenced an action in the district court of the county of Red Lake, Minnesota, against the defendants, alleging in their complaint that they were the owners in fee of an undivided five-sixths of the land here in controversy; that they and Moose Dung, the younger, are all of the heirs at law of Moose Dung, the elder, to whom the land was granted by the treaty of October 2, 1863;

that prior to 1895 all of such heirs were in possession of the land as tenants in common, when Moose Dung, the younger, claiming to own the whole of the land, purported to convey it to the defendants or their grantors, who took possession thereof, and excluded the plaintiffs therefrom. Their demand for judgment was that they are the owners of the undivided five-sixths of the land, and that they recover possession thereof. The defendants removed the action to the circuit court of the United States for the district of Minnesota, but that court, on the ground that it had no jurisdiction of the action, remanded it to the state court. The defendants then answered, denying the plaintiffs' alleged title to the land, and alleging, in effect, that by the laws and customs of the tribe of which Moose Dung, the elder, was chief the land descended to his eldest son, Moose Dung, the younger, to the exclusion of all other persons, and that through him they had acquired title to the land.

The cause being at issue, and the district court about to try it, the defendants sued out of this court an alternative writ of prohibition, based upon their petition, which alleged that the district court had no jurisdiction in the premises, for the alleged reason that the plaintiffs were all tribal Indians living upon a reservation set apart for the use and occupation of the Red Lake band of Chippewa Indians, of which they are members, and under the control of an agent appointed by the general government; and, further, that the sole issue of fact involved in the action is as to the law or custom of inheritance of real property prevailing within and governing such tribe. The return and answer of the plaintiffs to the alternative writ of prohibition and order to show cause why it should not be made absolute denied that the plaintiffs were tribal Indians, but, on the contrary, alleged that they were citizens of the United States, and denied that the sole issue in the action was one relating to the Indian custom of inheriting real property, and denied the sufficiency of the facts alleged in the petition to justify the issuance of a writ of prohibition. The defendants' reply put these allegations of the answer in issue.

On the hearing upon the alternative writ the evidentiary facts as to the questions whether the plaintiffs were tribal Indians and whether they were citizens were stipulated by the parties, and are

to the effect following: The plaintiffs were born on the Red Lake reservation, and have always, and still do, live thereon, and have never taken up their residence apart from their tribe, and are in charge of the government agent located on the reservation. Their names appear upon the rolls in his office, and they draw annuities from the government. They do not own any land in severalty, nor have they ever received any allotment of land in severalty, except that they claim to be heirs of Moose Dung, the elder, and the owners of an interest in the tract of land here in controversy. The plaintiffs reside separately from each other in log houses, with shingle roofs, and wear clothes similar to those worn by white lumbermen and white laboring men and white women of the poorer class of the vicinity. They use plain furniture, consisting of ordinary tables and chairs, and have cook stoves and ordinary cooking utensils. They cultivate gardens. The plaintiff Bem-way-bin-ness has a sewing machine, and owns three horses, and cultivates, and has cultivated for some time past, a tract of land, consisting of between fifteen and twenty acres, upon which he raises garden truck, and disposes of the same to lumbermen and other persons who come to buy. He has at various times worked in the lumber industry in the woods on the reservation and in driving logs on the river. The habits and customs and mode of life of the plaintiffs in general have never been, and are not now, different from the habits and customs and mode of life of the great majority of the other Indians residing in and upon the reservation, nor are their habits and customs different from those of many of the white settlers residing in the vicinity of the reservation. The plaintiffs are, and have been, members of the Roman Catholic Church, which holds services upon the reservation, but all of the Indians residing upon the reservation are and have been members or attendants upon either the Roman Catholic or the Episcopal Church.

While these facts show that the plaintiffs have reached a degree of civilization superior to that manifested by many white men, yet the facts warrant no other conclusion except that they are tribal Indians, and subject to the disabilities incident to their status as such. The plaintiffs, however, claim that they are citizens of the United States, notwithstanding their status as tribal

Indians, by virtue of section 6 of the act of congress of February 8, 1887 (24 Stat. 390), known as the "Dawes Act," the here-material provisions of which are these:

"And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, * * * is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

It is clear that the father of the plaintiffs, Moose Dung, the elder, was not a citizen, for he died fifteen years before the enactment of the Dawes act. It is equally clear that the plaintiffs cannot, in any view of the case, be held to be citizens unless they inherited from their father title to an undivided portion of the land in controversy, and are to be regarded as allottees within the meaning of the act referred to. Whether they did so inherit any part of the land is the vital question to be determined in the original action, and it ought not to be determined in this proceeding unless it be necessary to a decision thereof. We are of the opinion that it is not necessary to here determine the question, and for the purpose of this proceeding only we assume that the plaintiffs are not citizens.

This brings us to the question whether the plaintiffs may maintain their original action in the state court, although they are tribal Indians, and not citizens. This is an interesting and important question, and at the outset it is well to note that no officer or agent having charge of the Indians is here making any objection to the plaintiffs' maintaining their action, but that white men, citizens of this state, who are, as the plaintiffs allege, in possession of their land, over which the state and its courts have plenary jurisdiction, are the only parties questioning the jurisdiction of the court; and, further, that the federal courts have no jurisdiction of the action, and that, if the state court has not, then the plaintiffs have no adequate or practical remedy to redress

the alleged wrong. Our state constitution (article 1, § 8) provides that:

"Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely and without purchase; completely and without denial; promptly and without delay, conformably to the laws."

This opens the door of our courts to all persons, irrespective of race, color, creed, citizenship, or condition. Why, then, should that door be closed on the sole demand of the defendants against the plaintiffs, who only seek a fair opportunity to establish their alleged property rights? The answer to the question is to be found, if at all, in the relation of tribal Indians to the United States, which resembles that of a ward to his guardian. They are under the guardianship and protection of the general government. Cherokee Nation v. Georgia, 5 Pet. 1; Worcester v. Georgia, 6 Pet. 515. As an incident to such guardianship, the general government has exclusive control of Indians while on their reservations, and of their property thereon; and the state, by its courts or otherwise, may not interfere with or impair the efficacy of such guardianship. Therefore tribal Indians, for acts committed within the limits of their reservation, are not subject to the laws of the state. U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109; U. S. v. Shanks, 15 Minn. 302 (369); State v. Campbell, 53 Minn. 354, 55 N. W. 553; Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386.

This conclusion necessarily follows from the fact of such exclusive guardianship for the reason that, if the state should attempt to regulate the conduct of tribal Indians on their reservations, it would result in a divided control and inextricable confusion. But such reason does not exist when tribal Indians are off their reservations, and voluntarily come into the state courts to redress wrongs committed off the reservation to their person, character, or property. Such an Indian is subject to the criminal laws of the state when off his reservation, and may be sued in the state courts on a contract, or for a tort made or committed by him. 16 Am. & Eng. Enc. (2d Ed.) 215, 224. The reciprocal right to redress wrongs

87 M.—8

committed against him or his property off the reservation in the state courts ought, in justice, to be his. Neither reason nor public policy forbids it. The right of a tribal Indian to bring such an action in the state courts has been frequently sustained, and is sustained by the great weight of judicial authority. Selkirk v. Stephens, supra; Swartzel v. Rogers, 3 Kan. 374; Wiley v. Keokuk, 6 Kan. 94; Ingraham v. Ward, 56 Kan. 550, 44 Pac. 14; Whirlwind v. Von der Ahe, 67 Mo. App. 628; Felix v. Patrick (C. C.) 36 Fed. 457; Y-ta-tah-wah v. Rebock (C. C.) 105 Fed. 257; Felix v. Patrick, 145 U. S. 317, 332, 12 Sup. Ct. 862.

In the last case cited the supreme court of the United States treats the question as to the right of a tribal Indian not a citizen to maintain an action in a state court as one so thoroughly settled in favor of the right as to forbid any discussion of the question. Counsel for the defendants claim, however, that what was said on the question in that case was obiter. A reference to the facts of the case will clearly show that the claim is not correct. The facts were, briefly, these: Sophia Felix was a half-breed Sioux Indian residing near Mendota, Minnesota, to whom scrip was issued in separate parcels for the location in the aggregate of four hundred eighty acres. A portion of this scrip, calling for one hundred twenty acres, was obtained from her, and located upon land which at the time the litigation arose was within the limits of the city of Omaha, and of the value of $1,000,000. Her heirs, who were tribal Indians, brought an action in the year 1888 in the United States circuit court for the district of Nebraska to have the defendants declared trustees of the land for them on the ground that the scrip was obtained from their ancestor by fraud. The defendants demurred to the bill of complaint. The demurrers were sustained by the circuit court, and a decree entered dismissing the bill, from which the plaintiffs appealed to the supreme court, which affirmed the decree. The important question, and the one upon which the result depended, was the alleged laches of the plaintiffs,—twenty-eight years having elapsed after the transfer of the scrip before the action was brought. In reply to the claim of laches the plaintiffs urged that Sophia Felix and her heirs were, until 1887,—the

year before the action was brought,—tribal Indians, residing on their reservation in the state of Minnesota, and incapable of suing in any of the courts of the United States, and that they could not be chargeable with laches during the term of such disability. With reference to this question of laches the court said:

"Sophia Felix and her husband must have known that she had parted with the scrip; yet she lived until 1865, and her husband until 1882, without apparently making any attempt to discover what had become of it. Nor did their heirs apparently make any effort to discover it until 1887, when their intelligence seems to have suddenly sprung into activity upon their becoming citizens of the United States. 'It is scarcely necessary to say in this connection that while, until this time, they were not citizens of the United States, capable of suing as such in the federal courts, the courts of Nebraska were open to them, as they are to all persons, irrespective of race or color.' Swartzel v. Rogers, 3 Kan. 347; Blue Jacket v. Johnson, 3 Kan. 299; Wiley v. Keokuk, 6 Kan. 94."

The court held that the bill was defective, because it did not set forth any explanation of the lack of diligence on the part of the plaintiffs in discovering the fraud. This necessarily implies that, although the plaintiffs, prior to 1887, were neither citizens of the United States nor of the state of their residence, nor subjects of a foreign state, and could not maintain any action in the federal courts in any case where jurisdiction depended on diverse citizenship, yet the state courts were open to them at all times; otherwise their disability would have been total, and no lack of diligence in discovering the fraud could be imputed to them. It is obvious that what was said as to the plaintiffs' right to sue in the state court was not obiter, but one of the essential propositions upon which rested the conclusion that the bill was defective.

The defendants further urge that the courts of this state are without jurisdiction to hear and determine the questions at issue in the original action. We have stated the issues in that action, which is simply an action of ejectment for land lying outside of any Indian reservation, which is in possession of citizens of this state. The ultimate fact to be determined in the action is whether

the plaintiffs own any portion of the land. Whether they are heirs at law of Moose Dung, the elder, and whether the land in question descended according to the customs of the tribe to which they belong, and, if so, what are such customs, or according to the laws of the state in which the land lies, are incidental matters depending upon the evidence to be given on the trial, and from which the ultimate fact is to be determined. The district court of the state having jurisdiction of the parties to the action and of the subject-matter thereof, the land, it necessarily follows that it has jurisdiction to hear the evidence bearing on the question whether or not the plaintiffs have a cause of action.

The defendants cite in this connection and rely upon the case of U. S. v. Shanks, 15 Minn. 302 (369). The distinction between that case and the one here under consideration is manifest. In the former case the chief Hole-in-the-day died owing debts, and his creditors instituted proceedings in the probate court of the county of Morrison, Minnesota, to which the county of Cass was attached for judicial purposes, to settle his estate, and pay his debts therefrom. An administrator was appointed, who made application to the probate court for license to sell the real estate of deceased to pay his debts. At this stage of the proceedings this court, on the relation of the United States district attorney, Cushman K. Davis, granted a writ of prohibition, on the ground that the land in controversy was a reservation to Hole-in-the-day by virtue of the treaty with the Chippewa Indians of February 22, 1855 (10 Stat. 1165), which he occupied at the time of his death, and which retained its original character as an Indian reservation, from which the jurisdiction of the state for civil purposes was excluded; that is, it never attached. In the latter case the plaintiffs voluntarily came into the state court to assert their right to land lying outside of any Indian reservation, and over which the state had jurisdiction.

Our conclusion, based upon principle and authority, is that a tribal Indian, whether he be a citizen or not, may maintain an action in the courts of this state to redress any wrong committed outside of the limits of his reservation against his person or property.

It follows that the district court of the county of Red Lake has jurisdiction of the subject-matter of the original action and of the parties thereto, and that the alternative writ of prohibition and order to show cause must be discharged.   So ordered.