No. 12405

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

_____

STATE ex rel MARY IRON BEAR,

Petitioner,

-vs-

DISTRICT COURT OF THE FIFTEENTH JUDICIAL
DISTRICT OF THE STATE OF MONTANA, IN AND
FOR THE COUNTY OF ROOSEVELT AND THE HONORABLE
M. JAMES SORTE, District Judge,

Respondents.

_____

ORIGINAL PROCEEDING:

Counsel of Record:

For Petitioner:

Robert L. LaRoche argued, Wolf Point, Montana.

For Respondents:

James McCann, County Attorney, Wolf Point, Montana.
John T. McDermott argued, Missoula, Montana

Amicus Curiae

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
William Jensen argued, Assistant Attorney General,
Helena, Montana.

_____

Submitted: December 21, 1972

Decided: MAY - 2 1973

Filed: MAY - 2 1973

_____
                        Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an original proceeding wherein petitioner seeks a writ of mandamus directing respondent district court to take jurisdiction and determine the merits of a divorce action filed by petitioner in that court. Amicus Curiae briefs were filed by the Attorney General of the state of Montana, District Court Judge R. D. McPhillips, and the United States Attorney's office. John T. McDermott of the University of Montana Law School filed a brief on behalf of the respondent district court of the fifteenth judicial district, county of Roosevelt, and Hon. M. James Sorte, Judge.

Petitioner Mary Iron Bear filed a divorce action against Harry Iron Bear in October 1971. Both petitioner and her husband are enrolled members of the Assiniboine-Sioux Tribes and have resided within the exterior boundaries of the Fort Peck Indian Reservation since their marriage in April 1954, which marriage was solemnized under state law. Harry Iron Bear was personally served with process on the reservation in October 1971. Subsequently, on November 6, 1972, his default was entered by the clerk of the respondent district court. Petitioner then applied for judgment by default.

On November 10, 1972, on its own motion, respondent district court issued its findings of fact, conclusions of law and order dismissing the divorce action for lack of jurisdiction over the subject matter. The court based its decision on the conclusion that a certain 1938 tribal enactment purporting to cede jurisdiction over divorce matters to the state of Montana, was invalid. It relied specifically on three cases to declare the tribal enactment invalid: Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L ed 2d 507; Crow Tribe v. Deernose, 158 Mont. 25, 487 P.2d 1133; Blackwolf v. District Court, 158 Mont. 523, 493 P.2d 1293.

The 1938 Enactment by the executive board of the Assiniboine-Sioux Tribe reads in pertinent part:

"* * * no marriage or divorce of any member of this Reservation shall be valid or have any force or effect unless entered into or granted or decreed in accordance with the laws of the State of Montana * * *."

This Enactment bears the signatures of the Chairman and Secretary of the Fort Peck Indian Reservation Executive Board, and the recommended approval of Superintendent John G. Hunter.

Respondent court noted in its findings of fact that the Fort Peck Indian Reservation Tribal Court has interpreted the language above cited as ceding jurisdiction over divorce matters to the state of Montana. Since 1938 the Tribal Court has granted no divorces, while the respondent district court has granted hundreds to members of the Assiniboine-Sioux Tribe and other Indians residing within the exterior boundaries of the Fort Peck Reservation.

Here, two issues are involved which we combine for discussion inasmuch as both go to the jurisdiction of state courts over domestic relations of enrolled Indians on the Fort Peck Reservation.

The original issue: Do state courts have jurisdiction over divorce actions brought by an Indian plaintiff against an Indian defendant, both enrolled members of Fort Peck Tribes and residing on the Fort Peck Indian Reservation?

The second issue: Did the action of the respondent district court in this cause violate the Indian plaintiff's rights to the equal protection of the law?

We answer both issues in the affirmative.

Some twenty years ago this Court in Bonnet v. Seekins, 126 Mont. 24, 243 P.2d 317, held that the courts of this state are open to our Indian citizens. Later, in State ex rel. Kennerly v. District Court, 154 Mont. 488, 493, 466 P.2d 85, the Court said:

"Indians resident in Montana, whether they be full
blood or partial blood, allotted or unallotted,
domiciled on the reservation or off of it, of one
tribe or another, or whatever their status, are citi-
zens of the State of Montana. They are entitled to
the protection of our laws. * * *

"The state cannot disenfranchise an Indian person
nor can that Indian person disenfranchise the state
simply by being an Indian person or by living within
the external boundaries of an Indian reservation.
Thus, our courts are open to Indian persons. They
use the courts of this state for many things--divorces,
contracts, torts, inheritance, and the entire spectrum
of legal matters. Clearly, they are entitled to so
do. See Bonnet v. Seekins, 126 Mont. 24, 243 P.2d 317."

Kennerly was reversed by the United States Supreme Court,

400 U.S. 423, 91 S.Ct. 480, 27 L ed 2d 507, but it is important

to note that the United States Supreme Court action was based on

other grounds. Bonnet is still the law of this state.

As Mr. Justice Angstman noted in Bonnet, Montana is not

unique in holding that Indian citizens have the full use of their

state courts: Bem-Way-Bin-Ness v. Eshelby, 87 Minn. 108, 91 N.W.

291; Holden v. Lynn, 30 Okl. 663, 120 P. 246; Phillips v. Rey-

nolds, 79 Neb. 626, 113 N.W. 234; Martinez v. Martinez, 49 N.M.

83, 157 P.2d 484; Red Hawk v. Joines, 129 Ore. 620, 278 P. 572;

Missouri Pac. Ry. Co. v. Cullers, 81 Tex. 382, 17 S.W. 19, 41 Am.

Jur.2d, Indians, §20; 42 C.J.S. Indians, §8.

The right of an individual Indian citizen to sue or be

sued in the courts of this land was recognized by the United States

Supreme Court recently in Poafpybitty v. Skelly Oil Co., 390 U.S.

365, 88 S.Ct. 982, 19 L ed 2d 1238, 1243, where it said:

"Nor does the existence of the Government's
power to sue affect the rights of the indivi-
dual Indian. 'A restricted Indian is not with-
out capacity to sue or to be sued with respect to
his affairs, including his restricted property
* * *. Both the Act of April 12, 1926 and the
decision * * * in Heckman v. United States * * *
recognize capacity in a restricted Indian to sue
or defend actions in his own behalf subject only
to the right of the Government to intervene.'"

Two United States Supreme Court cases, Worchester v.

Georgia, 31 U.S. (6 Pet.) 515 (1832) and Williams v. Lee, 358

U.S. 217, 79 S.Ct. 269, 3 L ed 2d 251, 254, (1959), define the

power of Indian tribal governments and the authority of the Congress

of the United States as it concerns the jurisdiction question.

As we noted in Bonnet, this state and other states have long held

- 4 -

that an Indian has the same rights as are accorded any other person to invoke the jurisdiction of the state courts to protect his rights in matters not affecting the federal government.

The propriety of legal actions by Indians against non-Indians in the state courts has been recognized and approved by the United States Supreme Court in <u>Williams</u>. There the court speaking of the powers of states on Indian reservations laid down the test:

> "Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."

Using this test to judge jurisdiction in the instant case, we first examine the two essential elements set forth by the test:

1. Whether there is a governing Act of Congress?

2. Does state action infringe on the right of the Fort Peck tribe to make their own laws and be ruled by them?

As to element No. 1, we note that the Montana Enabling Act imposed the requirement of what is normally referred to as a "disclaimer" provision concerning the Indian population of the state. We adopted the disclaimer with identical language in Ordinance No. 1, Sec.2, Constitution of Montana. We have never before been required to rule directly on this provision's impact on civil jurisdiction. Other states have similar disclaimer provisions and have ruled on them. We will consider some of the cited cases.

> Montana's Enabling Act reads in pertinent part:
>
> "§4. * * * And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said states: * * *
>
> "Second. That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States * * *."

This disclaimer of a right and title to Indian lands is a disclaimer of a proprietary interest therein and control thereof, and not a disclaimer of governmental control. Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L ed 2d 573,583; Paiz v. Hughes, 76 N.M. 562, 417 P.2d 51; County of Beltrami v. County of Hennepin, 264 Minn. 406, 119 N.W.2d 25; State v. Danielson, 149 Mont. 438, 427 P.2d 689; Fournier v. Roed, (N.D. 1968), 161 N.W.2d 458; Sangre De Cristo Dev.Corp., Inc. v. City of Santa Fe, 84 N.M. 343, 503 P.2d 323. As noted above, here petitioner does not seek to assert any proprietary authority over lands of the Indian, but rather, governmental authority.

Most western states with the exception of South Dakota, Smith v. Temple, 82 S.D. 650, 152 N.W.2d 547, seem to hold that the disclaimer provision is not applicable where the issue does not concern Indian lands; we believe the cases are persuasive and we so hold.

Having so held, we now decide just what is the nature of that state jurisdiction. In Williams and Organized Village of Kake, the United States Supreme Court stated:

> "* * * even on reservations state laws may be applied to Indians, unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law." 7 L ed 2d 583.

We recognize that Public Law 280 of the 1953 Congress (67 Stat. 588) and the Civil Rights Act of 1968 (82 Stat. 78, 25 U.S.C.A. §§ 1321-1326) concerned jurisdictional problems on Indian reservations, but we concern ourselves with what effect, if any, those acts have on preexisting state jurisdiction. In Organized Village of Kake, a post-Public Law 280 case, the court made this statement:

> "* * * 'absolute' federal jurisdiction is not invariably exclusive jurisdiction." 7 L ed 2d 579.

It would appear from this statement that even after Public Law 280, states had some jurisdiction. Several states have considered this question and found some preexisting jurisdiction remained

after Public Law 280. Ghahate v. Bureau of Revenue, 80 N.M. 98, 451 P.2d 1002; Vermillion v. Spotted Elk, (N.D. 1957), 85 N.W.2d 432.

In Montana, the state assumed jurisdiction after Public Law 280 on only one reservation, Flathead. It has not acted concerning the other six Montana reservations and it still retains jurisdiction over areas of the law where there is neither a governing Act of Congress nor an infringement with reservation self-government.

The 1938 Enactment of the Assiniboine-Sioux tribes, which preexists by some years both Public Law 280 (1953) and the Civil Rights Act of 1968, is not changed by those acts. The district court's finding to the contrary based on Kennerly, Deernose, and Blackwolf is in error.

Kennerly did not consider the jurisdiction remaining in the state after federal action or tribal assumption of government, rather it emphasized the procedural aspects for tribal consent for jurisdiction.

The guide lines are set down in Williams and as long as the state does not violate those guide lines and does not attempt to exercise jurisdiction over areas of the law where there is either a governing Act of Congress or an infringement on reservation self-government, it may continue to exercise jurisdiction.

With the above in mind, does the state of Montana have jurisdiction over divorce actions brought by an Indian plaintiff against an Indian defendant, both residing on an Indian reservation?

We cannot find any Act of Congress or the executive branch of the federal government, nor are we cited any by amicus, setting forth who has jurisdiction over divorce on an Indian reservation. The Bureau of Indian Affairs regulations provide law and order codes but leave to the authorities of each tribe to define what constitutes divorce. 25 C.F.R., § 11.28. There are no federal limitations on the state's jurisdiction over divorce.

- 7 -

An examination of the 1938 Tribal Enactment indicates the intent was to do away with tribal jurisdiction over marriages and divorces and to rely on the laws of the state of Montana. We can find no interference with reservation self-government by the state of Montana here.

Article III, Sec. 6 of the Montana Constitution provides:

"Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character; and that right and justice shall be administered without sale, denial or delay."

Section 83-102, R.C.M. 1947, concerning jurisdiction, provides:

"The sovereignty and jurisdiction of this state extend to all places within its boundaries, as established by the constitution, excepting such places as are under the exclusive jurisdiction of the United States * * *."

Here, it was stipulated and agreed, and the district court found, that plaintiff Mary Iron Bear and her husband are resident citizens of the state of Montana and had been for some years before the filing of this action. Applying the test of jurisdiction set forth in Williams, we find no exclusive control by the United States government nor an interference with tribal self-government, therefore the district court erred in denying access to the state court in seeking a divorce.

In two recent cases, Mescalero Apache Tribe v. Jones, No. 71-738, decided March 27, 1973, 41 L.W. 4451, and McClanahan v. Arizona State Tax Commission, No. 71-834, decided March 27, 1973, 41 L.W. 4457, the United States Supreme Court considered: (1) the jurisdiction of a state to impose taxes on a tribal-owned enterprise located outside the limits of a reservation, Mescalero; and (2) the jurisdiction of a state to impose a tax on the income of a tribal member residing on a reservation whose income is wholly derived from reservation sources, McClanahan.

In Mescalero, the Supreme Court held that the state of New Mexico could impose a nondiscriminatory gross receipts tax on a tribal-owned enterprise located outside the limits of a reservation, but that the state could not tax personalty which has merged

with realty exempt under 25 U.S.C. § 465. In McClanahan, the Supreme Court held that the state of Arizona has no jurisdiction to impose a tax on the income of Navajo Indians residing on the Navajo Reservation and whose income is wholly derived from reservation sources.

As a preface to its discussion of the authority of the state over tribal enterprises outside reservation boundaries in Mescalero, the court said:

> "At the outset, we reject--as did the state court-- the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise '[w]hether the enterprise is located on or off tribal land.' Generalizations on this subject have become particularly treacherous. The conceptual clarity of Chief Justice Marshall's view in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 556-561 (1832), has given way to more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government. See McClanahan v. State Tax Commission of Arizona, ante,___; Organized Village of Kake v. Egan, 369 U.S. 60, 71-73 (1960). The upshot has been the repeated statements of this Court to the effect that even on reservations state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law. Organized Village of Kake, supra, at 75; Williams v. Lee, 358 U.S. 217 (1959); New York ex rel. Ray v. Martin, 326 U.S. 496, 499 (1946); Draper v. United States, 164 U.S. 240 (1896). Even so, in the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and McClanahan v. State Tax Commission of Arizona, ante,____, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent." 41 L.W. at 4452. (Emphasis supplied).

The court thus, in Mescalero, reiterated the proposition that the test as to the application of state laws on reservations is whether: (1) such application would interfere with reservation self-government, or (2) whether such application would impair a right preempted by federal law. The state thus has residual jurisdiction in areas where the federal law has not preempted state activity and the tribes have determined not to exercise jurisdiction.

In McClanahan the court indicated that the test for determining jurisdiction is now whether the federal treaties or statutes have preempted state jurisdiction using Indian sovereignty as a "backdrop against which the applicable treaties and federal statutes must be read." The court in McClanahan determined that based on the relevant treaties between the Navajos and the federal government and federal statutes applying inter alia to the Navajos, the state of Arizona has no jurisdiction to impose a tax on the income of Navajo Indians residing on the Navajo reservation and receiving income derived wholly from reservation sources.

Based on the holding in McClanahan, that the determination of jurisdiction is made by examining federal statues for preemption and federal treaties and statutes for the sovereignty of the tribe, the residual jurisdiction of the state over divorces on the Fort Peck Indian Reservation remains valid.

There is no federal legislation concerning the power to grant or deny divorces in Tribal Court. Unlike the power to tax, which is inherent in sovereignty, the power to terminate a marriage contract is not one which will interfere with tribal sovereignty. Because the power to grant a divorce has not been preempted by the federal government and does not interfere with reservation self-government (especially since the power granted to the state is merely residual) there is jurisdiction and the district court is required to exercise that jurisdiction.

Before a district court can assume jurisdiction in any matter submitted to it, it must find subject matter jurisdiction by determining: (1) whether the federal treaties and statutes applicable have preempted state jurisdiction; (2) whether the exercise of state jurisdiction would interfere with reservation self-government; and (3) whether the Tribal Court is currently exercising jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction.

This Court by this opinion has determined the district court has jurisdiction and petitioner's prayer for relief is granted. The trial court is directed to assume jurisdiction and determine the merits of the divorce action.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____
Associate Justices.

- 11 -

Mr. Justice Frank I. Haswell specially concurring:

I concur in the result, but in my view the rationale of the majority opinion is flawed. In my opinion this will lead to no end of difficulties in future Indian jurisdictional cases that may come before this Court.

The majority opinion is predicated on the jurisdictional test set forth in Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L ed 2d 251, i.e. whether state action infringes on the right of reservation Indians to make their own laws and be ruled by them. The Williams test was subsequently applied in Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L ed 2d 573. In one of the latest cases discussing the Williams test, the U.S. Supreme Court pointed out that this test was useful in situations involving the rights of Indians and non-Indians where both the Tribe and the state could fairly claim jurisdition. McClanahan v. Arizona State Tax Commission, No. 71-834, decided March 27, 1973, 41 L.W. 4457.

In McClanahan the court said:

"It must be remembered that cases applying the Williams test have dealt principally with situations involving non-Indians. See also Organized Village of Kake v. Egan, 369 U.S. 60, 75-76 (1962). In these situations, both the Tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The Williams test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected."

In the instant case, the situation is entirely different. This case involves the respective rights of two reservation Indians in a divorce case in a mutually acceptable forum with no assertion of antagonistic jurisdictional interests between the tribe, the state, the two Indians, or the federal government. The Williams test simply has no application to this situation and its continued indiscriminate application to all Indian jurisdictional questions in this Court is a mistake. Continued ad-

- 12 -

herence to the Williams test has previously resulted in reversals in the judgments of this Court. See Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L ed 2d 507.

The controlling consideration in this case, in my opinion, is whether the federal government has preempted the field of divorce leaving the tribal government powerless in this area. See McClanahan, pages 8-11 for rationale. Having been cited no relevant treaties or statutes of preemption and having found none, I conclude that residual power and jurisdiction in divorce cases remains in the tribe which ceded such residual jurisdiction to state courts in 1938. For Montana to deny two reservation Indians the use of its state courts in a divorce case under such circumstances would amount to a denial of equal protection of the laws to our Indian citizens.

I concur in the result of the majority on the foregoing basis.

                                        _____
                                             Associate Justice